**William E. GREENE, Plaintiff,**

**v.**

**LOEWENSTEIN, INC., Defendant.**

**No. 98–6788–CIV.**

United States District Court,
S.D. Florida.

April 27, 2000.

sons. *See also Martin,* 993 F.2d at 830 n. 10 (this circuit has "never embraced the *Gallina* dictum").

Karen Coolman Amlong, Jennifer Jean Ator, Amlong & Amlong, Fort Lauderdale, FL, for plaintiff.

Scott Alan Forman, Vernis & Bowling of Miami, North Miami, FL, Rodolfo Gomez, Dionne Wilson Blaken, Allen Norton & Blue, Coral Gables, FL, for Loewenstein, Inc.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

SELTZER, United States Magistrate Judge.

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment (DE 80) and was referred to Magistrate Judge Barry S. Seltzer pursuant to the consent of the parties. For the reasons set forth below, Defendant's motion is hereby GRANTED.

### I. BACKGROUND

Plaintiff William E. Greene ("Greene") brings this action against Defendant Lowenstein, Inc. ("Lowenstein"), his former employer, alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. § 760.10 *et seq.*

In July 1984, Lowenstein hired Greene as Plant Manager; he was then 44 years of age.[1] As Plant Manager, Greene was responsible for overseeing approximately 160 employees. In 1986, Lowenstein hired Carrol "Prim" Wood ("Wood") as Vice President of Operations; Wood became Greene's supervisor. The company came to view Wood's management style as dictatorial, condescending, and disrespectful. According to Lowenstein (and disputed by Greene)[2], Greene had a similar management style as Wood in that he typically micro-managed (rather than delegating work to his subordinate employees) and engaged in emotional outbursts. His approach allegedly resulted in a lack of communication, employee frustration and low morale, and hostility among the various departments. In his evaluations of Greene's job performance, Wood praised Greene's technical abilities but noted his need to improve his interpersonal skills.[3]

In 1995, Lowenstein assembled a Rep Council, consisting of several Lowenstein sales representatives from throughout the country, to identify changes the company could make to support its sales representatives and to improve customer service. Lowenstein contends that as a result of the Rep Council's recommendations, it decided to institute changes in its Operations Department. The company decided to replace Wood (62 years of age), the head of Operations, with a new Vice–President of Operations. To spare Wood the stigma of termination, the company asked him to resign. According to Lowenstein, Wood requested that the company announce his termination as a voluntary retirement. Following Wood's termination, Lowenstein's President, Craig Watts, temporarily assumed the responsibilities of Vice President of Operations, while the company recruited, hired, and trained someone for the position. Wood entered into a consulting agreement with Lowenstein to assist in the transition.[4] On February 19, 1996, Lowenstein hired Stewart Long as the new Vice President of Operations; Long was then 38 years of age.

During the period that Greene reported directly to Watts and during the beginning of Long's employment, Greene did not exhibit emotional outbursts in the workplace. Lowenstein, however, contends that later Greene again started to become dictatorial, condescending, and disrespectful toward his subordinate employees. Long decided to take Greene out of a supervisory position and place him in a non-supervisory position that would allow him to focus on his technical abilities.[5] Accordingly, sometime between November 1996 and March 1997, Lowenstein transferred Greene to the newly created position of Special Projects Manager.

In his new capacity, Greene initially received the same compensation and benefits as he had as Plant Manager, and in March 1997, he received a pay increase. As Special Projects Manager, Greene was to develop new techniques for lowering costs and/or increasing profits for the company. Long furnished Greene with a list of cost-reducing objectives and directed him to develop new cost-reducing and/or profit-increasing techniques on his own. Long

---

1. Greene did not have an employment contract; he was an at-will employee.

2. Greene has also submitted the deposition testimony and/or affidavits of seven Lowenstein employees who aver that Greene treated his employees well, was respected by them, and was a good plant manager.

3. Greene's three most recent evaluations, prepared by Stewart Long (the Vice President of Operations who replaced Wood), do not mention any problems with Greene's management style. And Greene testified that Long never informed him that he was condescending or dictatorial. Greene dep., vol. II, at 18–19.

4. Wood testified that Lowenstein gave him the choice of becoming a consultant or leaving the company.

5. Long testified that Craig Watts (President) and Joan Nolte (Human Resources Director) also participated in the decision to transfer Greene to Special Projects Manager. Long dep. at 29–30.

also directed Greene to prepare weekly reports of his activities. Lowenstein contends that Greene did not develop new techniques to save costs and/or increase profits, nor did he accomplish the majority of objectives that Long had given him.

In December 1997, Watts (President), Long (Vice President of Operations), and Joan Nolte (Human Resources Director) met with Greene to propose a change in Greene's compensation package for 1998. Long informed Greene that he had not developed sufficient cost-reducing or profit-increasing techniques to justify his $66,000 annual salary. But Long stated that the company valued Greene's experience and expertise and wanted to find a way to make both Greene and the company happy. Watts, Long, and Nolte then presented Greene with a written incentive-laden proposal under which he would receive an annual base salary of $40,000, plus quarterly performance-based bonuses of $30,000; the proposed package gave Greene the potential to earn $70,000, an amount slightly in excess of his current salary. Greene was informed that the terms of the proposal were not "etched in stone" and that the terms were negotiable and open for discussion. Greene stated that he would need to discuss the proposal with his wife before he made a decision. The company representatives encouraged Greene to take some time to consider the proposal. Approximately two weeks later, Greene had a five to fifteen minute conversation with Long and Nolte in which he informed them that the proposal as presented was unacceptable. Long and Nolte inquired whether there were any changes he would propose. Greene, however, did not attempt to negotiate the terms of the company's offer or to propose an alternative; he merely informed them that there were no changes "that [he] could think of." Greene dep., vol. II, at 141. Greene was "not in a negotiating mood." Greene dep., vol. II, at 142.

Following that meeting, Greene accepted a position as Plant Manager with Bryan Ashley, one of Lowenstein's competitors, earning the same salary as he had with Lowenstein. On December 12, 1997, Greene submitted his resignation from Lowenstein, effective January 2, 1998. After working approximately three weeks at Bryan Ashley, Greene voluntarily resigned his new position. Thereafter, on February 2, 1998, Greene filed a charge of age discrimination against Lowenstein with the EEOC.

## II. *STANDARD OF REVIEW*

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. An issue is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it must be decided to resolve the substantive claim or defense to which the motion is directed. *Id.; Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1993).

The moving party has the burden to establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the movant has satisfied its initial burden, the non-moving party must then go beyond the pleadings to rebut any facts properly presented; it may do so through affidavits or other evidence showing the existence of genuine issues of material fact for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Adickes*, 398 U.S. at 160, 90 S.Ct. at 1610.

Summary judgment is appropriate when, after adequate time for discovery, the non-moving party cannot establish an essential element on which it bears the burden of proof. *Celotex Corp. v. Catrett,*

477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* See also *Earley v. Champion Int'l Corp.*, 907 F.2d 1077 (11th Cir.1990).

In considering the motion, the Court must construe the evidence and the inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Furthermore, facts asserted by the party opposing a summary judgment must be regarded as true if supported by affidavit or other evidentiary material. *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584, 595 (5th Cir.1981)(quoting 10C Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 2727 at 524–30 (1973)).

## III. *MOTION FOR SUMMARY JUDGMENT*

 To establish a prima facie case of age discrimination, a plaintiff must prove the following elements: (1) he was between the ages of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position that he sought or from which he was discharged; and (4) he was qualified for the position. *Damon v. Fleming Supermarkets of Florida,* 196 F.3d 1354, 1359 (11th Cir.1999), *petition for cert. filed,* 68 USLW 3577 (U.S. Mar.

01, 2000)(No. 99–1459); *Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1432 (11th Cir.), *cert. denied,* 525 U.S. 962, 119 S.Ct. 405, 142 L.Ed.2d 329 (1998).[6] "Although a plaintiff's burden in proving a prima facie case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case." *Id.* at 1432 (internal citation omitted).

The parties do not dispute that Greene at age 57 is a member of the protected age group or that he is qualified for the positions of Plant Manager and Special Projects Manager. *See Damon,* 196 F.3d at 1360 ("Our precedent holds that if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position."). Lowenstein, however, argues that Greene cannot establish that he suffered an adverse employment action—the second element of the prima facie case.[7]

### A. *Transfer from Plant Manager to Special Projects Manager*

Greene alleges that his transfer from the Plant Manager position to the Special Projects Manager position constitutes an adverse employment action.

#### 1. *Timeliness*

To bring an action for age discrimination under the ADEA, a plaintiff must timely file a charge with the EEOC. In states with agencies empowered to remedy age discrimination, such as Florida, a plaintiff must file an EEOC charge within 300 days of the alleged discriminatory conduct. 29 U.S.C. § 626(d)(2). This Circuit has held

---

6. A plaintiff may also establish a prima facie case through either direct evidence or statistical proof of discriminatory intent. *Damon,* 196 F.3d at 1358 (direct evidence); *Baker v. Sears, Roebuck & Co.,* 903 F.2d 1515, 1521 (11th Cir.1990)(statistical proof). Greene, however, "does not contend that this is a direct evidence case and [he] is not relying on statistical evidence to oppose defendant's [summary judgment] motion." Response Memorandum at 1, n.1 (DE 149).

7. Lowenstein also initially argued that Greene cannot satisfy the third element—that he was replaced by a substantially younger person. In its reply memorandum, however, Lowenstein acknowledges that Greene can show that he was replaced by a substantially younger person as Plant Manager. Reply Memorandum at 7 (DE 159). No one but Greene, however, has ever served as Special Projects Manager.

that a plaintiff's failure to file charges with the EEOC within the applicable time period bars the claims contained in the untimely charge. *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 662 (11th Cir.1993), *cert. denied*, 513 U.S. 814, 115 S.Ct. 69, 130 L.Ed.2d 24 (1994).[8]

Greene filed his charge of discrimination with the EEOC on February 2, 1998. Any employment action occurring before May 8, 1997 (300 days before February 2, 1998), therefore, would be time-barred. *See Turlington*, 135 F.3d 1428 (affirming summary judgment in employer's favor in ADEA case where plaintiff relied on time-barred facts in attempt to establish a prima facie case). Greene testified at his deposition that he was transferred from the position of Plant Manager to that of Special Projects Manager sometime between November 1996 and February 1997. Greene dep., vol. I, at 113. Based on this testimony, therefore, Greene's ADEA transfer claim would be time-barred. Greene, however, contends that material issues of fact remain as to when his transfer occurred. He notes that he also testified at his deposition that his knowledge as to the timing of his transfer was "just a guess." Greene dep., vol. I, at 113, 117. But regardless of whether Greene knows the precise date of his transfer, his deposition testimony makes clear that it occurred more than 300 days before he filed his discrimination charge with the EEOC. Specifically, Plaintiff unequivocally testified that after he was transferred to Special Projects, *and by no later than March 1997* (more than 300 days before the EEOC charge), the two Assistant Plant Managers, John Reynolds and Brian Ellerhorst, assumed his responsibilities as Plant Manager. Greene dep., vol. I, at 113.

Greene additionally contends that Ellerhorst's deposition testimony creates a genuine issue of material fact as to the timing of Greene's transfer. According to Greene, Ellerhorst (who neither supervised nor worked with Greene after the transfer) "unequivocally" testified that Greene was in the Special Projects position for less than six months before he (Greene) resigned on January 2, 1998. If true, Greene's claim would be timely. But Ellerhorst's testimony was hardly unequivocal; indeed, he testified that he did not remember how long Greene was in Special Projects before he resigned:

> Q. And for approximately how many months did Mr. Greene work in special projects before he left the company?
>
> A. I can't tell you specifically how many months he did that. I don't remember.

Ellerhorst dep. at 70.

This Court cannot conclude that there exists a genuine issue of material fact as to whether Greene's transfer claim has been timely raised under the ADEA. In addition to Greene's own testimony that his transfer occurred between November 1996 and February 1997, Greene has submitted a performance evaluation, which he signed, showing that he had been transferred to the Special Projects position by at least March 13, 1997—more than 300 days before he filed his discrimination charge. See March 13, 1997 Evaluation, Plaintiff's Statement of Disputed Material Facts, Tab 16 (DE 151).[9]

---

**8.** The *Ross* decision involved Title VII time limits. However, "[b]ecause Title VII shares with ADEA a common purpose, i.e., elimination of discrimination in the workplace, because the statutory schemes are similar, and because both statutes require an almost identical filing with the appropriate agency within [300] days after the alleged discriminatory act, both this circuit and the Supreme Court have considered cases arising under one statute to have value as precedent for cases aris-

ing under the other." *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584, 587(5th Cir. 1981) (footnotes omitted).

**9.** Additionally, at his deposition, Greene was shown a document dated January 1, 1997, reflecting that he was still Plant Manager on that date. He was also shown a document entitled "Project Manager for 2–16–97" that listed the objectives for Greene to achieve as Special Projects Manager. Greene assumed that he received this document after his trans-

The requirement, however, that a claimant file "a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to sue in federal court, but a requirement that, like a statute of limitations, is subject to ... equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). The doctrine of equitable tolling permits a plaintiff to toll the running of the ADEA's filing period "if, in the period prior to the [300 days] before filing the initial EEOC charge [the plaintiff] had no reason to believe he was a victim of unlawful discrimination." *Turlington*, 135 F.3d at 1435. Greene argues that even if he had been transferred to the Special Projects Manager position by March 13, 1997, he did not become aware that his transfer constituted an act of age discrimination until the summer of 1997. He testified that he went into work one day that summer "and looked around and it dawned on [him that he was] the gray headed old man in the group." Greene dep., vol. II at 152–53. Greene's contention, however, is not persuasive.

The period for filing a timely charge of discrimination begins to run when the facts that support the charge are apparent or *should be apparent* "to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff." *Ross*, 980 F.2d at 660 (quoting *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 931 (5th Cir.1975)). *See also McClinton v. Alabama By–Products Corp.*, 743 F.2d 1483, 1487 (11th Cir.1984)(rejecting equitable tolling where ADEA plaintiff "suspects that he may have been discriminated against on account of his age and is also generally aware of his legal right to obtain redress for that wrong.").[10] Greene testified that no particular incident occurred between his March 13, 1997 transfer to the Special Projects position and the summer of 1997 to prompt him to believe that he had been discriminated against; rather, it just "clicked," and he realized that he was the "old man on the block." Greene dep., vol. II, at 151, 154. Yet, Greene knew before his transfer that many of the older workers had already left the company. Greene dep., vol. II, at 152–54. And he can point to no changed circumstances after his March 13, 1997 transfer that would have caused him to believe that the transfer resulted from age discrimination. Indeed, Greene acknowledged that at the time he was transferred (more than 300 days before he filed his EEOC charge) he possessed the same information that later (in the summer of 1997) made it apparent to him that he was the victim of age discrimination:[11]

Q. Can you tell me what leads you to [the] conclusion [that Lowenstein discriminated against you on the basis of your age]?

&ast; &ast; &ast; &ast; &ast; &ast;

A. As I started going to the meetings in Stewart's office it occurred to me actually in the summer of [1997], after I had been moved to Special Projects Manager ... that I looked around and there was nobody there but teenagers, all the old people had gone, and it started occurring to me, and I think I even mentioned it to my wife, how much longer it would be before this old dog will be gone.

And if you could sit in one of Stewart's meetings on a Tuesday afternoon, the oldest person there is probably John Reynolds, who is probably in his mid 30's, and I got the feeling that I was the grandfather around the whole building. It was just the

---

fer to Special Projects. He further assumed from the dates on the two documents that his transfer occurred sometime between January 1, 1997, and February 16, 1997. Greene dep., vol. II, at 55–58. The February 16, 1997 document, however, is not of record, and Greene's deposition testimony is too vague for the Court to conclude that Greene had been transferred by February 16, 1997.

10. In his deposition testimony, Greene acknowledged being aware that Lowenstein had a policy prohibiting discrimination in the workplace and encouraging complaints from employees who believed they had been victimized. Greene dep., vol. II, at 179–180.

11. Greene's belief that he was a victim of age discrimination stems from Lowenstein's replacement of several age-protected employees by younger employees:

Q. Sir, the information that you computed or dealt with in your mind to draw the conclusion in the Summer of 1997 was available to you from the beginning of 1997, when you were transferred to that position; correct?

A. Was the information available to me?

Q. Yes.

A. Yeah, if I sit [sic] down and thought about it, it probably was.

Greene dep., vol. II, at 154–55.

Given Greene's own testimony, this Court can only conclude that any basis for an age discrimination claim was or should have been apparent to Greene at the time of his transfer. The filing period, therefore, began to run at least by March 13, 1997, and there exist no circumstances that would warrant its equitable tolling. Ac-

> whole team that I had worked with for fourteen years had all of a sudden got extremely young. Al Campbell was gone, Bruce Bray was gone, Prim Wood was gone, and the people that you have anything in common with were just gone. So I assumed that I was going to be next.
> Q. Other than your perception that all the other workers were younger and that the older workers were leaving as of the time you were transferred to Special Projects, is there any other reason why you believed Lowenstein discriminated against you on the basis of your age?
> A. None that I can think of ... [o]ther than disruptively discharging me, no. Cutting my pay.
> Greene dep., vol. II at 146–49. In his Statement of Disputed Facts, Greene points to five age-protected workers (three of which the company terminated and two of which it promoted) that Lowenstein replaced with younger employees. On December 31, 1995, President Craig Watts (born in 1953) terminated Vice President of Operations Prim Wood (born in 1934), replacing him with Stewart Long (born in 1957). On March 8, 1996, Long terminated General Manager Al Campbell (born in 1940) and divided his responsibilities between Warehouse Supervisor Wilfredo Albarran (born in 1965) and Shipping Supervisor John Richtmeyer (born in 1953). Eight months later, Long reorganized that department, making Albarran the Manager of Warehouse and Shipping, with the older Richtmeyer reporting to Albarran. On June

cordingly, Lowenstein is entitled to summary judgment on the ADEA claim arising out of Greene's position transfer.

The FCRA, Fla. Stat. § 760.11(1), however, permits a plaintiff to file a discrimination charge up to 365 days after any alleged violation. Lowenstein has failed to establish the absence of any genuine issue as to whether Greene's transfer occurred more than 365 days before Greene filed his EEOC charge (February 2, 1998). Lowenstein, nonetheless, is entitled to summary judgment on Greene's FCRA transfer claim for a different reason—the transfer did not constitute an adverse employment action.[12]

### 2. Adverse Employment Action

 This Circuit has adopted an objective test for determining whether an employment action is "adverse." *Doe v.*

> 5, 1996, Long discharged Purchasing and Scheduling Manager Henry Weinberg (born in 1949) and replaced him with Liane Arlen (born in 1963) and Sue Britney (born in 1962). In 1993, Mike Paulus (born in 1959) replaced Vice President of Finance George Campagna (born in 1949) after the company promoted Campagna to Chief Financial Officer. And at some unidentified time, Watts promoted Vice President Wooten (born in 1946) to the presidency of Gregson and replaced him with Bob Price (born in 1959). Lowenstein responds that during this period Long also hired 51 year old John Bond to replace 31 year old Larry Scangas as Director of Engineering and promoted 61 year old Renate Garcia from Purchasing Agent to Buyer.

**12.** Even were this Court to find that Greene timely filed his FCRA claim and, further, that he had suffered an adverse employment action, it would nonetheless dismiss the state claim without prejudice. Title 28 U.S.C. § 1367(c)(3) grants a court the discretion to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction." Instructively, the Supreme Court has counseled that "[n]eedless decisions of state law should be avoided as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

*Dekalb County Sch. Dist.,* 145 F.3d 1441, 1449 (11th Cir.1998).[13] A "plaintiff must prove that a reasonable person in his position would view the employment action in question as adverse." *Id.* "[N]ot everything that makes an employee unhappy is an actionable adverse action," otherwise "every trivial personnel action that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Id.* (quotations and citations omitted). *See also Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996)(mere fact that employee dislikes employer's action not sufficient to establish adverse employment action); *Graham v. Florida Dept. of Corrections,* 1 F.Supp.2d 1445, 1450 (M.D.Fla.1998)("Plaintiff's unhappiness with the reassignment does not make the reassignment adverse."); *Perryman v. West,* 949 F.Supp. 815, 819 (M.D.Ala.1996)(An employment action "is not adverse merely because an employee dislikes it or disagrees with it."). The protection afforded by the ADEA (and FCRA) "extends to adverse employment actions which fall short of ultimate decisions." *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453 (11th Cir.1998). Therefore, "actions such as undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment are actionable...."[14] *Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1283 (11th Cir.1999). *See Dekalb County,* 145 F.3d at 1446 (A "transfer may sometimes constitute an adverse action."). But a "purely lateral transfer ... if not accompanied by any change in position, title, or salary, and that does not require significant retraining or result in loss of prestige or opportunities for promotion is not an adverse employment action." *Shah v.*

*Clark Atlanta University, Inc.,* No. CIV.A. 1:97–CV3786CAM, 1999 WL 1042979, at * 8 (N.D.Ga. July 20, 1999)(citing *Dekalb County,* 145 F.3d at 1449–50, 1453). *See also Dekalb County,* 145 F.3d at 1453 ("Any adversity must be material; it is not enough that a transfer imposes some de minimis inconvenience or alteration of responsibilities."); *Williams v. Bristol– Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996)("Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than minor change in working conditions will not do either.")(quoted with approval in *Dekalb County,* 145 F.3d at 1449 and n. 14); *Hudson v. Southern Ductile Casting Corp.,* 849 F.2d 1372, 1375 (11th Cir.1988)(plaintiff's alleged demotion to position of plant guard, which resulted in no reduction in pay or loss of benefits, could not support Title VII action); *Smith v. Alabama Dep't of Pub. Safety,* 64 F.Supp.2d 1215, 1221–1223 (M.D.Ala.1999)(transfer from one city to another did not constitute adverse employment action); *Whitehead v. Norfolk Southern Ry. Co.,* 53 F.Supp.2d 1380, 1382–83 (M.D.Ga.1999)(plaintiff's transfer from north end to south end of yard did not constitute adverse employment action); *Cargile v. Horton Homes,* 851 F.Supp. 1575, 1578 (M.D.Ga.1994)(plaintiff's transfer from one section of a manufacturing plant to another was not an adverse employment action because he "suffered no loss in pay and benefits as a result of the transfer."). By contrast, "transfers that [do] result in lesser pay, responsibilities, or prestige [15] will ... be 'adverse.' So,

---

**13.** Although the court in *Dekalb County* was addressing an Americans with Disabilities Act ("ADA") claim, it expressly recognized the importance of an objective test to prove adverse employment action with respect to other types of discrimination claims as well.

**14.** This Circuit has noted that for employment actions short of ultimate decisions "there is

some threshold level of substantiality that must be met for unlawful discrimination to be cognizable....." *Wideman,* 141 F.3d at 1456.

**15.** This Circuit has held that loss of prestige is one factor a court should consider when determining whether an employment action is adverse: "[W]e believe that loss of prestige, either within an organization or with regard

too, will transfers that involve arduous travel or that impede an employee's professional growth or advancement." *Dekalb County*, 145 F.3d at 1452 (citations omitted)("In other words, our reasonable person standard will continue to protect ... employees from transfers that are a form of demotion or that disrupt investment in education, training, or seniority."). *See also Eskra v. Provident Life and Accident Ins. Co.*, 125 F.3d 1406, 1412 (11th Cir.1997) (plaintiff's transfer to Pittsburgh from Miami constituted adverse employment action because plaintiff's proposed income after first year in Pittsburgh was not guaranteed to be equal to his income in Miami).

▮ As Plant Manager, Greene was required "to ensure that Lowenstein's existing manufacturing methods and/or processing were properly implemented by the workers within the plant so that profits were increased or costs were decreased." Reply Memoranda at 4–5 (DE 159)(citing Greene dep., vol. II, at 58–61, 70–71). After his transfer to Special Projects Manager, Greene was required "to create new manufacturing methods and/or processes to be implemented by the workers in the plant to ensure that Lowenstein increased profits or decreased costs." Reply Memoranda at 4 (DE 159)(citing Greene dep., vol. II, at 58–61, 70–71). As Special Projects Manager, Greene initially received the same pay and benefits he had as Plant Manager, and he thereafter received a pay increase. Furthermore, he continued to report to the same supervisor, the second highest in command at the company. The most significant difference between the two positions is that as Special Projects Manager Greene did not supervise others. This Court cannot conclude that Greene's change of responsibility and focus from the implementation phase to the creation phase of manufacturing, coupled with the pay raise he received, can objectively be viewed as a demotion.

Greene, however, does not argue that his transfer was adverse because it was to a non-supervisory position. Rather, he maintains that it was adverse due to "the loss of his office,[16] his exclusion from morning meetings [17] and the realization that he could be replaced with someone from the outside for less money than he was being paid." [18] Response Memoranda

to the general public, is an objective factor that a court should consider as part of the reasonable person test. Beyond the loss of prestige itself (a reasonable if egoistic employee goal much like salary or promotion), diminishment of prestige may also affect an employee's marketability, another significant objective factor." *Dekalb County*, 145 F.3d at 1452 n. 19. Although Greene has cited cases for this general proposition, he has not presented any evidence that the position of Special Projects Manager is objectively any less prestigious than the position of Plant Manager. Moreover, the record is devoid of any evidence that Greene subjectively perceived his transfer as less prestigious or that he ever complained about his transfer. According to Greene, he was unhappy with the change of position because he believed his strength lay in managing people. Greene further believed that the company would either cut his salary or "get rid" of him; he based this belief on his view that plant managers generally earn higher salaries than special projects managers. Greene dep., vol. 1, at 119–20.

**16.** Three or four months after Greene became the Special Projects Manager, the two Assistant Plant Managers were assigned the office Greene had been using as Plant Manager. Greene was thereafter given an another office, which he shared with another employee. Greene dep., vol. I, at 116–117.

**17.** As Plant Manager, Greene conducted an hour long meeting each morning to discuss the plant's objectives that day. Greene dep., vol. I, at 31, 52. Present at those meetings were the superintendents responsible for scheduling, purchasing, and manufacturing, as well as the warehouse representative and the Human Resources Director. Greene dep., vol. I, at 31–32, 52. After Greene became Special Projects Manager, the two Assistant Plant Managers took over the morning meetings as they were then responsible for the scheduling and operation of the plant. Greene dep., vol. I, at 116. Greene testified that his presence at the meetings was no longer required. Greene dep., vol. I, at 116.

**18.** Although Greene was not happy with the transfer because he believed supervision was his forte, he does not allege that the loss of supervisory responsibility is the basis for his adverse employment argument.

at 17–18 (DE 149). Yet, this Circuit has noted that for employment actions short of ultimate decisions "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable...." *Wideman,* 141 F.3d at 1456.[19] Having to share an office and no longer being required to attend certain meetings does not meet a "threshold level of substantiality." This Court concludes as a matter of law that Greene's transfer from Plant Manager to Special Projects Manager is not actionable; no "reasonable person in [Greene's] position would view the employment action in question as adverse." *Id.,* 145 F.3d at 1449.

### B. *Constructive Discharge*

■■■■■ Greene additionally argues that his resignation constitutes a constructive discharge. An ADEA claim may be predicated on a constructive discharge. *See, e.g., Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1559 (11th Cir.1988); *Carr v. Cohen,* 44 F.Supp.2d 1240 (M.D.Ala. 1999). The test for a constructive discharge is an objective one. *Virgo v. Rivi-*

era Beach Assoc., Ltd., 30 F.3d 1350, 1363 (11th Cir.1994). "A claim for constructive discharge requires the employee to demonstrate that the work environment and conditions of employment were so unbearable that *a reasonable person* in that person's position would be compelled to resign." *Id.* (emphasis added). *See also Thomas v. Dillard Dept. Stores, Inc.,* 116 F.3d 1432, 1433–34 (11th Cir.1997); *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 905 (11th Cir.1988); *Wardwell v. Sch. Bd. of Palm Beach County, Florida,* 786 F.2d 1554, 1557 (11th Cir.1986); *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980).

In support of his constructive discharge argument, Greene posits that his employment became intolerable because "the terms of the 'Proposal for Position' slashed [his] salary by a third and proposed to bind [him] to nebulous standards that would have been little more than an invitation to termination and, additionally took away [his] van." Response Memorandum at 18 (DE 149).[20]

---

19. In *Wideman,* the plaintiff alleged the following adverse employment actions: after improperly listing the plaintiff as a no-show on her scheduled day off, her supervisor required her to work without a lunch break when she came in to check on the mistake; her supervisor gave her two written reprimands, even though he had never before done so in the plaintiff's eleven months of employment; her supervisor imposed a suspension after the second reprimand; her supervisor began soliciting employees for negative comments about plaintiff; the manager threatened to shoot plaintiff in the head after plaintiff said she would call headquarters about not being scheduled to work; and an assistant manager deliberately delayed authorizing medical treatment after plaintiff suffered an allergic reaction. The court found that the "totality of the alleged reprisals" was sufficient to satisfy the adverse employment action requirement for a prima facie case of retaliation.

20. The "Proposal for Position" provides as follows:

Time Frame: January 1, 1998 to December 31, 1998

Salary: Base salary of $40,000 paid weekly through December 31, 1998

Bonus: Potential of additional $30,000 per annum paid in quarterly increments by the end of the month following the calendar quarter for years 1998 and 1999.
¶ Cost saving proposals to save materials, production time, labor or other methods of cost control.
¶ Any testing necessary to verify cost savings or investment of equipment or tooling will be taken from savings calculation.
¶ Savings must be in place and generating revenue for Lowenstein.
¶ The VP of Operations and Controller will audit savings for accuracy and measurability at the end of each quarter.
¶ The first $25,000 in cost savings will not count toward bonus in 1998. In order to achieve maximum bonus for 1998 there must be cost savings of $175,000 of which 20% of $150,000 ($30,000) will result in the maximum achievable bonus for 1998. In order to achieve maximum bonus for 1999 cost savings of $150,000 must be achieved to receive the maximum 20% bonus as long as the audit process shows that savings has continued into that year.

This Court concludes that no reasonable jury could find that Lowenstein's negotiable[21] proposal to modify Greene's compensation package constitutes a condition "so difficult or unpleasant that *a reasonable person* would have felt compelled to resign." *Hill v. Winn–Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir.1991)(emphasis in original). As noted by the Court in *Hill*, "[b]efore finding a constructive discharge, this [Circuit] has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of intolerable." *Id.* at 1527. Here, Greene was presented with a proposal to modify his compensation package; it potentially could have increased his salary. The company informed him that the proposal was not "etched in stone," and it encouraged him to consider it further. Rather than negotiate with the company or propose alternative terms, Greene merely informed the company that its offer was unacceptable

> ¶ Responsibilities of position continue to include product development and other duties as assigned.
> ¶ By signing this agreement, individual agrees not to directly or indirectly engage in or have any interest in any sole proprietorship, partnership, corporation or business or any other person or entity that directly or indirectly engages in competition with Lowenstein, including vendors for a two (2) year period following the payment of final bonus check.
> ¶ Termination of employment and this agreement may occur if at least 50% of bonus goal is not met by July 1, 1998, or if any Lowenstein practice or procedure that governs the employee/employer relationship is not observed or if there is a change in business conditions. If individual elects to terminate employment prior to the December 31, 1998, the non-compete agreement is in effect. Lowenstein agrees to still pay quarterly bonus as earned through end of 1999. Either party may terminate this agreement with 30 days written notice.

Proposal for Position, Ex. 2 to Defendant's Statement of Undisputed Facts (DE 81).

21. Greene testified about the proposal:

> Q. In fact, they encouraged you to take some time and think about the proposal, didn't they?
> A. Yes.

and that he could not propose any changes. Greene, without justification, "assumed the worst" and "jumped to conclusions too fast." *See Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987)(discussing constructive discharge, court stated that "a reasonable employee" is one who does not "assume the worst" or "jump to conclusions too fast."). On these facts, this Court cannot conclude that a reasonable person could find that Greene's working conditions "approached the level of intolerable." *Id.* Accordingly, the Court concludes that Greene was not constructively discharged. Rather, he voluntarily resigned his employment with Lowenstein to take a Plant Manager position at a competing company.

## IV. *CONCLUSION*

For the foregoing reasons, this Court concludes that there exists no genuine issue as to any material fact that would

> Q. And they told you that this proposal was not etched in stone and it was negotiable; didn't they?
> A. Yeah.

Greene dep., vol. II, at 132.

> Q. Did you try to negotiate the proposal?
> A. No.
> Q. You simply told them it's unacceptable and that was the end of the conversation?
> A. Yes.
> Q. Without giving ... them the opportunity of negotiating ...; correct?
> A. True... They asked me if there was [sic] any changes that I could make and I said there was none that I could think of
> ...
> A. I was not in the negotiating mood.

Greene dep., vol. II, at 141–42. Greene now argues that this testimony creates a genuine issue of material fact as to whether the proposal was negotiable. According to Greene, this dialogue "demonstrates that it is equally likely that [he] was saying that if he didn't accept this proposal, he might as well—and did—resign." Response Memorandum at 18 (DE 149)(emphasis in original). The Court is not persuaded by this argument. Greene's own testimony makes clear that the terms of Lowenstein's proposal were negotiable.

preclude granting summary judgment on Greene's age discrimination claims. Greene's ADEA claim based on his transfer was untimely filed. Furthermore, his transfer from the position of Plant Manager to that of Special Projects Manager was not adverse. Finally, Lowenstein's proposed, negotiable revision to Greene's compensation package did not render his working conditions so intolerable as to constitute a constructive discharge. Lowenstein's Motion for Summary Judgment, therefore, is GRANTED.