**Robert E. HANSEN II, Plaintiff,**

v.

**PERRY TECHNOLOGIES, an operating unit of Lockheed Martin Corporation, and Lockheed Martin Corporation, Defendants.**

**No. 01–8593–CIV.**

United States District Court,
S.D. Florida.

April 18, 2002.

Robert A. Bogdan, Robert Anthony Bogdan P.A., Pompano Beach, FL, for Plaintiff.

M. Susan Sacco, Thomas C. Garwood, Jr., Ford & Harrison LLP, Orlando, FL, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon the defendants' Motion for Summary

Judgment, filed February 14, 2002 (DE# 20). On March 6, 2002, the plaintiff filed his response, with the defendants filing their reply thereto on March 14, 2002. Accordingly, this issue is ripe for disposition. The Court has reviewed the record, the submissions of counsel, and is otherwise fully advised in the premises. On April 17, 2002, the Court heard oral argument concerning this motion. For the following reasons, the Court shall grant the defendants' motion for summary judgment.

## I. *Standard of Review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of meeting this rather exacting standard. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In applying this framework, the evidence, and all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Arrington v. Cobb County,* 139 F.3d 865, 871 (11th Cir.1998); *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997).

Equally clear, however, is the principle that the nonmoving party bears the burden of coming forward with evidence of each essential element of their claims, such that a reasonable jury could find in his or her favor. *See Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). The nonmoving party "[m]ay not rest upon the mere allegations and denials of [its] pleadings, but [its] response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also LaChance v. Duffy's Draft House, Inc.,* 146 F.3d 832, 835 (11th Cir.1998) ("Summary judgment may be granted if the evidence is 'merely colorable.' ") (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Further, and significantly, mere conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment. *See Earley,* 907 F.2d at 1081. The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

The Eleventh Circuit has noted that "claims of employment discrimination ... present fact-intensive issues [but that] motions for summary judgment or judgment as a matter of law are appropriate to 'police the baseline for hostile environment claims.' " *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244 (11th Cir.1999) (en banc) (quoting *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 n. 8 (5th Cir.1999)). It is from this point that the Court begins its analysis.

## II. *Facts*

Viewing the evidence in the light most favorable to the plaintiff, as the nonmoving party, the Court recites the following factual scenario. The plaintiff, Robert Hansen II ("Hansen") filed this action on June 27, 2001, alleging violations of racial discrimination and retaliation under 42 U.S.C. § 1981. Hansen, a white male, was hired on April 11, 2000, as a contract worker in the Material Control Department of Perry

Technologies' ("Perry") Material Control Department at their Riviera Beach, Florida location.[1] As a Material Control Clerk, Hansen was responsible for receiving shipments and delivering them to the appropriate departments at the facility and outside of the workplace, shipping out materials based on product orders, general clean-up of the facility, and assisting other departments if needed. In late July of 2000, Hansen was hired as a regular employee (as opposed to a contract worker) at Perry.

Hansen worked with a number of individuals at Perry, including Arthur Brown ("Brown"), a Perry employee intricately involved in the action at bar. Brown's employment position during most of the time period in question was as a "lead man," reporting to Cecil Sparks ("Sparks"), the Manufacturing Manager. Included in Brown's responsibilities as a lead man were overseeing the shipping and receiving department, dealing with material control work orders, issuing parts, and taking items from the work orders to the appropriate department at the Riviera Beach facility.[2] As a lead man, Brown also assigned job tasks to the workers in the material control department, decided who would work overtime when it was needed, and had the ability to alter Hansen's work and lunch schedules. Hansen stated that Brown was his direct supervisor. Other employees in the material control department included Don Brown (no relation to Arthur Brown) and Jim Berger ("Berger"), both of whom had duties similar to those of Hansen. The top supervisory position at Perry's Riviera Beach facility was Director William Hayes ("Hayes"), to whom Sparks directly reported. Both Arthur Brown and Don Brown are African–American; Hayes, Sparks, and Berger are white.

Immediately after Hansen began working at Perry, he was subjected to racially related comments from Brown. These comments included: "So, have you [Hansen] ever worked for a black man before?" asked on Hansen's first day of work; "What are you looking for, your Klan membership card?" asked while Hansen was loading paper into his computer printer; "Today, the cracker gets to ride in the back of the truck," made just before Hansen was to go out on a delivery, and referencing the seating arrangement on the delivery truck; "Okay, all you pimps and ho's, me and Don [Brown] are hitting the road so you crackers can deal with this asshole while we're gone"; "Wait a minute, this time the cracker is gonna have to wait in line," made while Hansen was attempting to ask for help regarding his job; "What is this, a Klan barbecue?" made while Brown walked by the break-room, where employees including Hansen were gathered; "What is this, a Klan meeting?" made while Brown walked through the receiving area. It is undisputed that Perry had a discrimination and harassment policy in effect at all relevant times, about which Hansen was fully aware.

On May 2, 2000, Hansen approached a coworker, Steve Sarkozy ("Sarkozy"), about Hansen's issues with Brown's comments. Sarkozy in turn called Ken Sebok ("Sebok"), Perry's Ethics Representative, and left a voicemail message with Sebok concerning Hansen's issues. The next day, Hansen, Sarkozy, and Sebok met to discuss the matter in person. At that time, Hansen gave to Sebok a list of racial-

---

1. Perry is an operating unit of defendant Lockheed Martin Corporation.

2. When asked whether he had "any supervisory functions over the other employees in the [material control] department," Brown responded "Yes, I was their leadman." Arthur Brown depo. at 07:13–15.

ly related comments that Brown had made and told Sebok that the comments were bothering him. Hansen indicated that he wanted the comments to stop, but did not wish to create a big issue out of the situation. In addition to some of those quoted above, the comments on this list included "Keep on walking 'cause this is a NWA meeting'. No whites allowed," made as Hansen approached Brown with a question; "I just hired you on to even things up a bit down here," referring to the ratio of black to white workers; and "Get over here before I take my belt off," made periodically when Brown needed help with something. Sebok told Hansen that he would look into the matter, and get back to Hansen within a couple of days. Sebok further informed Hansen that it was appropriate that Hansen come to him with any such issues involving alleged racial harassment.

Sebok in turn reported on the incident to Sparks and Hayes, the latter being the top supervisor at that facility. These three men discussed the situation, and Sparks then set up a meeting with Brown. When confronted by Sparks at that meeting, Brown admitted to making the comments and agreed to stop making any ra-

cially related comments. On May 9, 2000, Sebok informed Hansen that Perry management had met with Brown concerning Hansen's concerns, that retaliation was a possibility but that these situations were to be kept confidential, and that Sebok would intervene in the event of any sort of possible retaliation due to Hansen's complaint.

Hansen stated that after this, Brown's comments decreased in frequency.[3] Significantly, following this early-May complaint and counseling procedure, Sparks inquired of Hansen in June,[4] July,[5] and August[6] of 2000 as to any further issues arising from comments made by Brown. Each time Hansen told Sparks that he was experiencing no further issues with Brown. Sebok too asked Hansen about any further problems with Brown's racially related comments, to which Hansen gave the same negative response.[7] Hansen stated in his deposition that he was afraid of being seen as a "complainer," as he was at that time trying to become a full-time Perry employee. At the July meeting between Sparks and Hansen, Doug Odell ("Odell"), the Production Material Supervisor, was also present. Shortly after this meeting, Hansen approached Odell and "just told him what [he] had experienced, and that was

3. In his deposition testimony, Hansen stated that "[i]nstead of routinely throughout the day, the comments were sporadic, two or three, four times a day. I felt like he [Brown] was watching his step. And I rarely heard 'pimps and ho's' anymore." Hansen depo. at 69:18–21.

4. "He [Sparks] just asked me if they [Brown's comments] were continuing. I said no. And that was about it. He just said, 'I'll check back periodically.'" Hansen depo. at 77:25–78:03.

5. At Hansen's "hiring on" meeting, when he changed from being a contract worker to a regular Perry employee, Sparks "just asked [Hansen] if everything was okay regarding the

situation," meaning the situation involving Brown, to which Hansen replied, "'Everything's fine.'" Hansen depo. at 79:08–15.

6. In a meeting between Sparks and Hansen, which occurred in Sparks's office, the two men had the "same, brief, to the point" conversation. Hansen depo. at 80:06. At this meeting, Hansen again informed Sparks that everything was "fine." See id. at 80:07–08.

7. "And I did follow up with Rob once or twice, just to ask if everything was okay. And I don't remember my exact words, but we wanted to be proactive, and just find out if there were any an if this problem had continued.... But there were no indications of a problem." Sebok depo. at 19:13–22.

it." Hansen depo. at 82:13–14.[8] There is no evidence that Hansen approached Odell again until the October complaint.[9]

In late July of 2000, Hansen applied for and was accepted as a regular worker at the Riviera Beach facility. His job location and duties remained the same as they had been when he was working as a contract employee. Hansen received a pay raise. He was not due to be considered for another pay raise until his annual performance review in June of 2001; Hansen resigned before this performance review occurred.

Hansen then made no further complaints to anyone in management at Perry until mid-October of 2000.[10] The precipitating events for this complaint were a comment Brown made while walking by the receiving area, where Hansen and two other employees were talking, asking whether this was a "Klan meeting." Then, later that day, Hansen was speaking with another coworker, Teresa Drolet, when Brown asked Drolet if he could borrow her pen; when Drolet said no, Brown asked her something to the effect of, "You don't think a black man can borrow a pen without being accused of stealing?"[11] The other employees specifically noted that Brown, who Hansen himself described as a "jokester," Hansen depo. at 50:18, made these comments in a "joking manner." Sebok depo. at 21:01. Hansen then went to Odell, who worked in the same department as Hansen. Hansen felt that Odell was someone he could trust. Hansen stated in his deposition that he asked Odell whether they should get Sebok involved in this matter, to which Odell responded that "he'd rather handle it." Hansen depo. at 90:09. However, Odell did immediately report this complaint to Sparks, who in turn reported it to Sebok.

Sparks set up a meeting with Brown, at which Sebok "felt that [he] ought to sit in . . . this time, just to raise the level of awareness of the company's concern of— re-express the company's concern that this should not happen; it's inappropriate, it's wrong; [they] don't condone it." Sebok depo. at 21:11–15. Odell stated in his deposition that after this meeting between Brown, Sebok, and Sparks, "it was like a light switch. Arthur [Brown] stopped joking around about everything, and [Odell] thought everything was pretty much hunky-dory." Odell depo. at 23:04–07. Hansen disputes that Brown stopped making these comments, and due to the summary judgment standard, the Court takes this as true. However, after this October meeting, Hansen made no further complaints to anyone in Perry's management. Hansen felt that after September of 2000, though, he was denied overtime opportunities, which were disproportionately given to Don Brown, Jim Berger, and another contract worker. The affidavit of Ed Shea, Perry's Senior Manager of Business

---

8. As one of Hansen's supervisors, it was appropriate for Hansen to approach Odell with concerns about harassment, discrimination, and similar issues. *See* Sebok. depo. at 32:03–09.

9. Specifically, at his deposition, after having described this July conversation with Odell, Hansen was asked, "What was the next that you had a conversation with Mr. Odell concerning Mr. Arthur Brown and his conduct?" Hansen replied, "I recall October [of 2000]." Hansen depo. at 82:25–83:05.

10. Hansen did state in his deposition that he asked Brown three times in September of 2000 to stop using the objected-to comments. However, Hansen did not follow up on this with a complaint to Sebok, Sparks, or Odell.

11. A slightly different version of this event was given by Brown, who said that Drolet had asked him if he had borrowed her pencil, to which Brown responded, "Why are you asking me, because I am black?"

Operations, indicates that a review of the payroll records revealed that Hansen had more overtime hours than both Don Brown and Jim Berger in January 2001, and more than Jim Berger in both March and April of that same year. Hansen also states that he was given less desirable job assignments and required to do pick-ups and deliveries in inclement weather; that numerous email requests to Grace Sawyer, an African–American employee, went unanswered[12]; and that Brown instructed him that he was no longer able to work with Teresa Drolet, a white employee, concerning purchase orders.[13] Hansen has submitted an affidavit concerning this final incident, wherein he states that in early November 2000, he approached Odell about Brown's prohibition against Hansen working with Drolet, and that Odell told him that there was nothing he could do about that particular issue. In his deposition, Don Brown stated that he too was instructed not to work with Teresa Drolet on certain matters. *See* Don Brown depo. at 22:01–25.

On January 23, 2001, Hansen's work hours were changed from 8:00 a.m.—4:30 p.m. to 7:30 a.m.—4:30 p.m.[14] On January 26, 2001, Don Brown instructed Hansen to remove some garbage, and Hansen was told that his breaks were being shortened from fifteen to ten minutes. Concerning the garbage removal, Brown stated that certain boxes needed to be removed from in front of a fuse panel, as their collection in that location created an Environmental Safety and Health Organization violation. *See* Arthur Brown depo. at 31:06–32:14. Hansen did not refute this. Also on January 26, 2001, Sparks discovered an unidentified box of materials in his office. Upon learning that Hansen had left the box there, he asked Hansen to come to his office to discuss the matter. When Hansen got to Sparks's office, Hansen grabbed the box and, according to Sparks, walked out while acting in a rude manner. Sparks then requested a meeting with Hansen about this attitude. At first, Hansen refused to come to this meeting without Sebok, the Ethics Representative, present as well. However, Hansen did eventually meet with Sparks without Sebok's attendance on January 31, 2001. Sparks felt that as this incident did not implicate ethical issues, it was unnecessary to have Sebok in attendance. At this meeting, Hansen

---

12. A series of emails attached to Hansen's deposition partially undermines this statement, as Hansen repeatedly asked Sawyer whether she had seen a certain item; her short answer was "NO." Although perhaps curt, Sawyer did apparently respond to these email queries. Hansen did state, however, that Sawyer admitted in a meeting to having erased some of Hansen's emails, although Sawyer stated that this was done accidentally. *See* Hansen depo. at 114:21–115:03. Hansen also stated that a coworker, Jim Berger, was also experiencing these "communication problem[s]." *Id.* at 115:18–23. Additionally, Hansen stated that there were no negative repercussions on his job performance as a result of not getting replies to these emails. *See id.* at 133:21–134:05.

13. Hansen admitted in his deposition that this decision was made not by Brown, but by Sawyer herself. *See* Hansen depo. at 103:17–23.

14. Brown stated that this was due to an incident where a delivery driver had arrived one morning shortly before 7:00 a.m. with a shipment, and no one was in the material control department to receive it. Jim Berger, one of Hansen's coworkers, arrived every morning at 7:00 a.m., but his first duty was to inspect all the forklifts, in a different part of the building. Sparks wanted someone to be in the material control department at all times, and therefore Brown, after asking Don Brown if he could do it (he could not because he was at that time in the process of moving), asked Hansen to begin arriving at 7:30 a.m. *See* Arthur Brown depo. at 22:22–24:01. Hansen does not rebut this explanation.

apologized and admitted that his conduct in handling the situation had been improper. *See* Hansen depo. at 215:07–09.

At some point in January of 2001, Hansen's lunch break was changed from 11:30 a.m.—12:00 p.m. to 12:00 p.m.—12:30 p.m. In February, in Hansen's presence, Don Brown threw a clipboard across a room, although Hansen stated that Don Brown threw the clipboard away from him, and out of anger at customers and other employees failing to correctly fill out certain forms. *See* Hansen depo. at 154:14–24. Also in February, Don Brown threw a tape gun across a room, which landed at Hansen's feet. Hansen did not know about what Don Brown was upset. *See id.* at 155:05–156:03.

In mid-April of 2001, Arthur Brown transferred to a different department, which was located in a different building. Don Brown was then made lead man in the material control department. Hansen objected to this decision, feeling that the department "should have had a meeting as a unit and discussed it." *Id.* at 188:11–12. In early May of 2001, Hansen and Don Brown got into a slight altercation, at which time Hansen told Don Brown that the latter "had no balls" and that he needed to demonstrate some courage in order for the department to come together as a team. On May 4, 2001, Hansen sent an email to Hayes, Sparks, Sebok, and Don Brown, inquiring as to what Hansen describes as "some sort of investigation" concerning his whereabouts earlier that day, when Hansen had been at a doctor's appointment. Also, Hansen states that his April 20, 2001 paycheck was missing his overtime pay; this sum, however, was later paid to him.

On May 11, 2001, Hansen left for a two-week trip to Norway, where he was to get married. Hansen returned to work on May 27, 2001. On June 5th, 8th, and 18th, Don Brown, Hansen's lead man, noted that Hansen was repeatedly leaving work without telling Don Brown that he was doing so.[15] Don Brown also noted that Hansen was spending quite a bit of time on the computer and on the phone doing nonwork tasks. On June 7th, Hansen sent Don Brown an email, complaining that his desk area had been rearranged in his absence, and citing a lack of communication skills in the department. Hansen further threatened that "[a]ny more disruptions like this and I will not hesitate to go to corporate ethics because it's simply not right." Hansen depo. ex. 17. In response, Don Brown sent Hansen a reply email reminding Hansen that as lead man in the department, Don Brown need only report to Sparks, the Manufacturing Manager, concerning changes in the department. Don Brown also contacted Julie Gerzanics, a Human Resources employee, concerning Hansen's series of emails. Gerzanics in turn contacted Lockheed Martin's Manassas, Virginia, headquarters about the situation. On June 19, 2001, Don Brown received a phone call for Hansen; he was unable to transfer the call, however, as Hansen had left the building without informing Don Brown of this.

Then, on June 19, 2001, Sparks met with Hansen again. Present at this meeting were Sparks, Hansen, Don Brown, and Steve Grider, another Perry employee who acted as a witness to this meeting. Sparks wanted to discuss Hansen's May 1, 2001, confrontation with Don Brown, and Hansen's absence from work on April 12, 2001,

---

**15.** Hansen's statement of facts includes a rebuttal of this allegation: "Plaintiff denies that this was the case, and reiterates that the accusations were harassment motivated by retalia- tory motive." This type of unsupported denial is insufficient to create a genuine issue of fact.

the next day after which Hansen had gone fishing. Sparks also suspected that Hansen was saving his vacation days for his honeymoon. At this meeting, Hansen stated that the reason for the April 12th absence was a sinus problem. Sparks asked Hansen to bring in medical documentation of this by June 26, 2001. These men also discussed Perry's policy on who needs to be contacted when an employee calls in sick. Hansen indicated that he had not known that the production manager should be called first, and then the department lead man. Hansen stated, however, that he now understood the proper procedure, as written instructions concerning the sick-day procedure had been provided the day prior during a manufacturing meeting.

The next day, June 20, 2001, Hansen contacted Julie Gerzanics with a question about the company's sick-day policy. That same day, Gerzanics got back to Hansen with the answer to his question.[16] Also that same day, Don Brown noted that Hansen was printing out on his computer and during working hours a large amount of material relating to the company's ethics policy. At this time, Sparks had written a negative performance evaluation concerning Hansen, but Hansen never saw this, as he resigned before the evaluation was disclosed or placed in his personnel file.

On June 22, 2001, Hansen sent an email resignation to Sparks, Don Brown, and Sebok, ending his employment "effective immediately." Five days later, Hansen filed the instant federal action.

### III. *Analysis*

Hansen has brought his claims of racial discrimination and harassment, as well as unlawful retaliation, under 42 U.S.C. § 1981.[17] In analyzing claims brought under this Section, courts utilize the same analysis as that applicable to claims brought pursuant to Title VII of the Civil Rights Act of 1964. *See Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir.1994); *Gullatte v. Westpoint Stevens, Inc.*, 100 F.Supp.2d 1315, 1317 (M.D.Ala. 2000).

#### A. *Race Discrimination*

Hansen's claim of race discrimination is predicated on his claim that Brown's comments created a racially hostile work environment. "A hostile work environment claim ... is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The Eleventh Circuit's choice of language here is noteworthy, as "permeated" connotes significantly more than

**16.** Gerzanics informed Hansen that the company followed a policy of "Management Discretion," which meant that "[m]anagers can ask for verification, at their discretion." Hansen depo. ex. 16.

**17.** Section 1981 states, in relevant part:

(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and en-

force contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ....

.    .    .    .    .

(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

many other adjectives the appellate court could have chosen. The parties readily agree that the ·heart of the issue in this case are two of the factors necessary for a plaintiff to be successful on a claim like this: (1) whether the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (2) whether Perry, the employer, is to be held liable for the comments of its employee, Brown. *Id.*

■ The Court will address these considerations in turn. The severity element encompasses both an objective and a subjective prong, meaning that the conduct in question must be something that "a reasonable person would find hostile or abusive" and something that the employee "subjectively perceive[s] ... to be abusive." *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. First, viewing the evidence in the light most favorable to Hansen, the Court finds that he has met the second component of the severity inquiry, that he subjectively felt the conduct to be abusive. It is clear that Hansen felt Brown's race-related comments created a hostile or abusive environment. Second, there are several factors consistently identified as germane to the objective component of the severity-of-harassment inquiry, including: (1) the frequency of the conduct in question; (2) the severity of this conduct; (3) whether the conduct is "physically threatening or humiliating, or a mere offensive utterance"; and (4) whether there was any unreasonable interference with the employee's performance of his or her job. *Miller,* 277 F.3d at 1276. Further, this is a totality-of-the-circumstances type test. *See id.; see also Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir.1999) (en banc). The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's

position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (internal quotation omitted). Additionally, the Supreme Court has "made it clear that conduct must be *extreme* to amount to a change in the terms and conditions of employment ...." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (emphasis added).

Applying this standard to the facts at bar, the Court concludes that the conduct at issue did not extend far enough to in fact *alter the conditions* of Hansen's employment and create a hostile work environment. Several considerations lead the Court to this conclusion. First, while the conduct could be characterized as frequent, the vast majority of statements to which Hansen was able to point occurred during the initial stages of his employment. However, viewing the facts most favorably to Hansen, the Court finds that the racial comments were made frequently. *See Miller,* 277 F.3d at 1276 (concluding that ethnic slurs "hurled" at the plaintiff three to four times a day for a period of one month was "frequent"). Second, while the Court recognizes that Hansen subjectively felt that Brown's comments were severe, many other employees (including Hansen himself) considered Brown a "jokester" and some saw his comments as made in this vein. This is a factor to be considered in the objective inquiry, although obviously making discriminatory comments in a joking manner of course does not completely relieve them of their pejorative weight. Additionally, Hansen stated that to him, Brown's using the term "cracker" was tantamount to a white person's use of the word "nigger." Whatever the relation between these words, the Court agrees that they are both offensive. However, only three of Brown's comments cited by Hansen use the term "cracker."

Nearly all the rest reference the Ku Klux Klan. This is in contrast to *Miller*, where the comments "hurled" many times a day at the plaintiff, a Mexican–American worker, included "Wetback," "Spic," and "Mexican Mother F------." 277 F.3d at 1274. Noting "[t]he very nature of the coworkers' utterances," the Eleventh Circuit concluded that the jury reasonably decided that these comments were, *inter alia*, sufficiently severe to have created a hostile work environment. *See id.* at 1277. Here, the "very nature" of Brown's references to the "Klan" are less severe than those that directly focus on Hansen's race. Finally, in the case at bar, some of the comments were made to groups of Perry employees comprised of both white and African–American individuals. This somewhat discounts the objective severity of Brown's comments.

However, after reviewing the sum of the circumstances, the Court finds the two most telling aspects of this analysis to be the lack of any physical intimidation or humiliation and Hansen's ability to continue with his job without "unreasonable interference." None of the race-related comments cited by Hansen indicate in any way that Brown physically threatened or intimidated him. The only comment arguably threatening in this manner was Brown's admonition to "get over here before I take off my belt"; although referring to physical conduct, this comment has *nothing to do* with race.[18] Although Hansen states that Brown said some of his race-related comments while looking Hansen in the eye, this does not automatically morph a comment into a physical threat. Hansen argues that *Miller* supports his contention that Brown's comments were severe. However, in *Miller*, the coworkers of a Mexican–American employee "used the derogatory names in an intimidating manner, shouting them at [plaintiff] during the course of berating him for his job performance, or when they were 'arguing with him,' were 'mad with him,' or were 'taunting him.'" 277 F.3d at 1277. No similar facts have been produced in the case at bar. The only instance of Brown yelling at Hansen did not involve racial slurs or comments of any sort, but rather related to Grace Sawyer's request that Hansen stop working with Teresa Drolet. Further, Hansen stated that the vast majority of comments made by Brown after the May, 2000, counseling he was given by Perry management, were not directed toward Hansen himself, but rather were overheard in passing. *See* Hansen depo. at 69:22–70:03. Therefore, the evidence demonstrates that the element of physical intimidation or threatening was lacking from Brown's comments.

Additionally, and significantly, Brown's comments did not unreasonably interfere with Hansen's job performance. Following Hansen's initial complaints about Brown's statements, Hansen applied for an was hired as a regular Perry employee. Along with this, Hansen received a pay raise. Hansen's claim that he was unable to communicate effectively with other employees due to his fear of being subjected to racial harassment is a rather broadbrush statement unsupported by factual girders. Finally, the Court observes that objective issues with Hansen's work performance that were noted by Perry management did not arise until January of 2001, well after Hansen's May and October complaints. In sum, a review of the affidavits, deposition testimony, interrogatory

---

18. The Court also notes that Brown's "pimps and ho's" comments, at times made to mixed crowds, is similarly not race-related. "Innocuous statements or conduct, or boorish ones that do not relate to the [protected characteristic] of the offended party (the plaintiff), are not counted." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir.2000).

answers, and consideration of statements of counsel indicates that Brown's comments did not interfere with Hansen's work duties. Furthermore, any interference that may have occurred was not "unreasonable" so as to be actionable in this forum.

Therefore, upon consideration of the evidence in the light most favorable to Hansen, the Court concludes as a matter of law that Hansen has not made out an actionable claim for a racially hostile work environment under § 1981. Although Brown's comments may have been made frequently, the other factors in the analysis point to the conclusion that the comments were not sufficiently severe or pervasive to alter the conditions of Hansen's employment. *Cf. Mendoza*, 195 F.3d at 1248 (stating that "to the extent [plaintiff] showed frequent conduct, the frequency of it does not compensate for the absence of the other factors."). The Court in no way condones these comments made by Brown. They are offensive and should be eliminated, and not only from the workplace environment. However, at the same time, the Court notes that under these circumstances, this task falls squarely to the employer, and not the federal judiciary. It is imperative to keep in mind that neither Title VII nor § 1981 is a "general civility code" for the workplace. *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (quoting *Oncale*, 523 U.S. at 80, 118 S.Ct. 998).

However, even assuming *arguendo* that Brown's comments were sufficient to set forth an actionable claim for a racially hostile work environment, Hansen must also establish some reason for holding Perry, the employer, liable. *See Mendoza*, 195 F.3d at 1245. This inquiry initially pinions on whether or not Brown was Hansen's "supervisor."

A supervisor "has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The determination of whether an individual is a supervisor vis-à-vis a discrimination plaintiff-employee is a significant one, for "a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer." *Miller*, 277 F.3d at 1278. Different standards apply where it is a supervisor doing the alleged harassing. Although the issue is hotly debated among the parties, the Court concludes that Hansen has proffered sufficient evidence such that a reasonable jury could conclude that Arthur Brown was in a supervisory position at Perry relative to Hansen. Accordingly, the Court shall proceed operating under the assumption that Brown was Hansen's supervisor.

■ The Supreme Court has recently spoken in this area. In both *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Court issued the following holding:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . .

harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *see also Miller*, 277 F.3d at 1278 (describing this framework). The threshold issue is whether Hansen suffered a "tangible employment action." The Court concludes that he did not.

"A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits." *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257 (emphases added). Obviously, the key is that the change need be "significant." In "most cases," such a tangible employment action "inflicts direct economic harm" and "requires an official act of the enterprise, a company act." *Id.* at 762, 118 S.Ct. 2257. Hansen did not suffer any such employment action.[19] Conversely, approximately two months after his initial complaint about Brown's comments, Hansen was hired on as a regular Perry employee. Hansen's arguments concerning loss of overtime, basically the only economic injury alleged, are refuted by the evidence concerning Perry's payroll records. Fur-

ther, the defendants have set forth an undiscredited legitimate business reason as to why Hansen may have at times received less overtime than some of his co-workers—that Hansen was not fully trained in the required area of "material control" functions as compared to the "shipping/receiving" functions. *See* Don Brown aff. ¶ 4. Hansen does not controvert this statement. Hansen's claim that he was denied an opportunity to work in the quality control area, which would have included some overtime hours, fails to make out a tangible employment action, as Hansen admits that this assignment was almost immediately discontinued. *See* Hansen depo. at 100:10–25. Nothing else that Hansen cites, including not being able to work with Teresa Drolet, but rather being required to work with Grace Sawyer; some unanswered email queries; and his bald statements of having to work in inclement weather, amount to a tangible employment action. *Apropos* of many of Hansen's arguments in this regard, the Eleventh Circuit has noted that "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir.2001). Although far from unheard of, federal courts are loathe to second-guess these business decisions, as "Title VII [nor § 1981] is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business deci-

---

**19.** To the extent Hansen argues that there is a genuine issue of fact as to whether he suffered a tangible employment action in the form of a constructive discharge, this argument fails as a matter of law. " 'To show constructive discharge, the employee must prove that his working conditions were so difficult or unpleasant that a reasonable person would have

felt compelled to resign.' " *Hill v. Winn–Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir.1991) (quoting *Wardwell v. School Bd. of Palm Beach County, Fla.*, 786 F.2d 1554, 1557 (11th Cir.1986)). These working conditions must approach the level of "intolerable." *Id.* Hansen's argument in this regard fails as a matter of law.

sions." *Id.* (internal quotations and citations omitted). Therefore, as a matter of law, Perry is entitled to assert the *Faragher–Ellerth* affirmative defense.

■ Perry has established the first element of this affirmative defense. In order to do so, Perry must show by a preponderance of the evidence "that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior ...." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. "Under the law of the Eleventh Circuit, the employer need not take all possible methods to remedy harassment once it is put on notice, rather, the 'remedial action must be reasonably likely to prevent the misconduct from recurring.'" *Benn v. Florida East Coast Ry. Co.,* 1999 WL 816811, at *5 (S.D.Fla.1999) (quoting *Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 754 (11th Cir.1996)). Here, there is no dispute that Perry's Riviera Beach facility had an anti-harassment policy in effect, and that Hansen knew about this policy and how it was used. Further, within one week of learning of Hansen's complaint concerning Brown's race-related comments, Hansen, Sarkozy, and Sebok had met to discuss the issue; Sebok had reported to Sparks; Sparks had met with Brown and discussed the severity of the issue; and Sebok had reported all of this back to Hansen. Under the *Faragher–Ellerth* affirmative defense, "an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d

1305, 1314 (11th Cir.2001). Perry's action met this requirement.

After this intervention, Hansen repeatedly assured both Sparks and Sebok, upon the latter men's affirmative inquiries into the situation, that everything was "fine." An employer like Perry should not be legally forced to go behind such reassurances to plumb the depths of a possibly lingering problem. *See, e.g., Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1366 (11th Cir.1999); *see also Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295, 299–300 (5th Cir.2001) ("Even so, [the defendant-company] cannot be held liable for conduct of which it had no knowledge. [Plaintiff] had the obligation to report the alleged harassment to [the defendant-company] as she had been instructed. Her failure to do so is fatal to her case.").[20]

When management was again alerted to Hansen's complaints in October of 2000, there was another meeting with Brown, and this time Sebok, Perry's Ethics Representative, attended, reinforcing the notion that the issue was a weighty one. Hansen argues that this was not enough; that Perry management did not do enough in the way of preventing Brown from making the comments in question. Significantly, "Title VII [and hence, § 1981] does not require that an employer use the most serious sanction available to punish an offender ...." *Landgraf v. USI Film Prods.,* 968 F.2d 427, 430 (5th Cir.1992), *aff'd,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). After Hansen's repeated reassurances that everything was

---

**20.** In *Coates,* the court stated:

Federal law has now attempted to correct the problem of workplace . discrimination, but it cannot be done without the cooperation of the victims, notwithstanding that it may be difficult for them to make such efforts. When an employer has taken steps, such as promulgating a considered sexual

harassment policy, to prevent sexual harassment in the workplace, an employee must provide adequate notice that the employer's directives have been breached so that the employer has the opportunity to correct the problem.

164 F.3d at 1366.

"fine" as between himself and Brown, and the fact that several months had elapsed since Hansen's first complaint, Perry was entitled to utilize this avenue of disciplinary means. Given the instant set of circumstances, it was not required to do more.

Therefore, upon a thorough review of the undisputed material facts, and considering the facts in dispute in the light most favorable to Hansen, the Court concludes that the defendants have established the first element of the *Faragher–Ellerth* affirmative defense as a matter of law.

Under the second element of the defense, the defendants must show "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. After the October meeting between Brown, Sebok, and Sparks, Hansen did not complain to anyone in Perry's management concerning Brown's race-related comments. Therefore, as relates to any comments made by Brown after October of 2000, Hansen failed to "take advantage of any preventive or corrective opportunities provided by the employer." Therefore, the defendants have established the second element of the *Faragher–Ellerth* affirmative defense.

As per the above analysis, the Court concludes that Hansen has failed as a matter of law to establish that he was subjected to an actionable hostile work environment. However, even if Hansen did establish that he was subjected to such an environment at Perry's Riviera Beach facility, and further assuming that Brown was Hansen's supervisor, the defendants are entitled to summary judgment on their *Faragher–Ellerth* affirmative defense as against Hansen's claims of racial discrimination.

### B. *Retaliation*

Hansen has also asserted a claim under § 1981 for retaliation taken against him as a result of his complaints concerning Brown's comments. "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to [his or] her protest,' so long as [he or] she had a reasonable good faith belief that the discrimination that the discrimination existed." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir.1989)).[21] To establish a prima facie case of retaliation, Hansen must prove all of the following: (1) that he participated in an activity protected by § 1981; (2) that he suffered an adverse employment action; and (3) that there is a causal connection between elements (1) and (2). *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000) (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir.1999)). Hansen's claim fails as a matter of law on the second and third elements.

Concerning the contours of an "adverse employment action," the Eleventh Circuit has recently stated,

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause, the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way. Although

---

**21.** "Given that Title VII jurisprudence provides the rubric for analyzing employment discrimination claims under § 1981, Title VII case law is an appropriate point of reference in analyzing Plaintiff's claim." *Mitchell v. Carrier Corp.*, 954 F.Supp. 1568, 1576 (M.D.Ga.1995), *aff'd without op.*, 108 F.3d 343 (11th Cir.1997).

the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir.2001). The determination of whether something constitutes an adverse employment action must be made on a case-by-case basis, *see Gupta,* 212 F.3d at 587; and, like the hostile work environment analysis, contains both an objective and a subjective component. *See Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1448–49 (11th Cir.1998).

█ Much of the discussion *supra* relating to whether Hansen suffered a "tangible employment action" is also germane to the determination of whether he suffered an "adverse employment action." Hansen has not set forth evidence that could lead a jury to conclude that he suffered a "serious and material" change in the conditions or terms of his employment. He argues, for example, that the items on his desk being rearranged; being told to take out some garbage; being precluded from working with Teresa Drolet; having his lunch schedule shifted by half an hour; having his breaks being shortened by five minutes; and having a clipboard and a tape gun thrown in his presence all indicate that he suffered from retaliation. Although perhaps subjectively unacceptable,

the protections of the federal discrimination and harassment laws "simply do not extend to 'everything that makes an employee unhappy.'" *Davis,* 245 F.3d at 1242 (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997)). Almost none of these actions carried with them any sort of negative financial repercussions. Those few that arguably did were explained by legitimate business reasons, which Hansen failed to refute. Although financial impact is not a *sine qua non* of an adverse employment action, it is certainly relevant to the determination. In sum, the actions cited by Hansen in support of his retaliation claim did not affect him in an objectively serious and material manner.

█ Furthermore, Hansen does not proffer sufficient proof as to the causal connection prong of his burden of establishing a claim for retaliation. "To establish a causal connection, a plaintiff must show that 'the decision-maker[s] [were] aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'" *Gupta,* 212 F.3d at 590 (quoting *Farley,* 197 F.3d at 1337). Hansen himself stated that the only persons who knew that he had complained about Brown's comments were Sebok, Sparks, Odell, and Hayes. *See* Hansen depo. at 223:06–11. However, Hansen does not argue that these men participated in any of the allegedly retaliatory actions. By way of example, Grace Sawyer, who held the same position at Perry as Teresa Drolet, made the decision that Hansen should work with her and not Drolet; there are no allegations that Sawyer knew of Hansen's complaints about Brown. The only allegation Hansen sets forth in his opposition to defendants' motion for summary judgment that one of the men who knew of his complaints acted on this is that "Sparks wanted to fire plaintiff" and gave

Hansen a "severely negative performance appraisal." Pl.'s Opp. to Defs.' Mot. for Summ. Judg. at 19. However, Hansen resigned before this performance appraisal was disclosed.[22] Additionally, as mentioned above, the defendants explained many of the allegedly retaliatory actions with legitimate business reasons, about which Hansen failed to create a genuine issue of fact. *See Gupta,* 212 F.3d at 592.

Therefore, viewing the evidence in the light most favorable to Hansen, the Court concludes that he has failed to set forth evidence upon which a jury could reasonably find that he suffered illegal retaliatory actions due to his protected complaints about the comments of Arthur Brown. Accordingly, the defendants are entitled to summary judgment on this claim as well.

### IV. Conclusion

Based on the above analysis, the Court finds that the defendants' motion is due to be granted.[23] Accordingly, it is hereby

ORDERED AND ADJUDGED that the defendants' Motion for Summary Judgment (DE# 20) is GRANTED. Final Judgment shall be entered by separate Order.

---

**22.** Even if this performance appraisal *had* been disclosed, "courts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." *Davis,* 245 F.3d at 1241.

**23.** For this reason, the Court need not address the defendants' contention that § 1981 does not apply to at-will employees.