Larry Wayne LAWRENCE, Plaintiff,

v.

**WAL–MART STORES, INC., Defendant.**

**No. 6:01–CV–1415–ORL–31K.**

United States District Court, M.D. Florida, Orlando Division.

Dec. 2, 2002.

**1318**

Gregorio A. Francis, Morgan, Colling & Gilbert, P.A., Orlando, FL, Mary E. Lytle, Amari & Theriac, P.A., Cocoa, FL, for Plaintiff.

Scott A. Forman, Patrick H. Gonyea, Matthew S. Kish, Michael Craig Scher, Vernis & Bowling of Miami, P.A., North Miami, FL, for Defendant.

## ORDER

PRESNELL, District Judge.

This cause comes before the Court on consideration of Defendant's Motion for Summary Judgment (Doc. 65) and Plaintiff's Opposition thereto (Doc. 89).

### I. Background

Plaintiff, Larry Wayne Lawrence, began working at the Port Orange supercenter location of Defendant Wal–Mart Stores, Inc. ("Wal–Mart") between May 15–17, 1999 (Pl.'s Depo. at 72). At that location, Plaintiff was the only African–American management-level employee. As assistant manager, Plaintiff was assigned to oversee Area A and later Area D. (*Id.* at 88).[1] Co-manager Ron Dixon directly supervised Plaintiff, and Robert Mulack was the store manager. During Plaintiff's eight-month employment at the Port Orange store, Dixon allegedly made several race-related comments to Plaintiff, including: 1) on Plaintiff's first day of work, Dixon said in front of another co-manager, Gary Graves, that Plaintiff should be careful in Port Orange because the police frequently pulled over and harassed a former African–American employee (*id.* at 97, 116); 2) Dixon said, during lunch with Plaintiff some time during the summer of 1999, that he had slept with a black woman and that she was too aggressive for him, "you know how you all can be" (*id.* at 97–98, 115); 3)

---

1. According to Vice President Ed Nagy, a Wal–Mart supercenter typically has four areas, A—D, with one assistant manager usual-ly, but not always, assigned to each area. (Nagy Depo. at 18)

while patting Plaintiff on the back[2] (id. at 279–80), Dixon said to Plaintiff in September or October of 1999, "... I have that gun [like the one that was missing from the store] at home along with several more at home just like it to shoot blacks." (*Id.* at 99–100; 115); 4) in a discussion held prior to November 9, 1999 between Plaintiff, Mulack, and Dixon, about Mulack's daughter being interested in dating an African–American man, Dixon said "I guess your daughter has 'Jungle Fever.'"[3] (*Id.* at 105–07); 5) during a November 9, 1999, manager's meeting, Dixon said, in response to positive feedback from upper management about Plaintiff's work-related photos,[4] "I've got two words for you Wayne, low key, low profile. We don't like superstars around here and we don't like heroes.... remember how we did blacks back in the thirties when they got out of hand ... we would take them out back and lynch them" (*id.* at 122); 6) on December 9, 1999, Dixon said that his friend called Plaintiff a "Jesse Jackson type black guy" if he continued to complain to Dixon's superiors (*id.* at 114); 7) Dixon referred to Plaintiff twice as "homeboy,"[5] once or twice as "boy," and daily as "brother." (*Id.* at 278–79).

Plaintiff admits that he did not respond to the first comment about being pulled over by the local police. (*Id.* at 108). Plaintiff claims, however, that he responded to the second comment about sleeping with a black woman. (*Id.* at 108). Plaintiff did not respond to or report the third comment regarding the missing gun because he was "terrified" and because as Plaintiff's supervisor, Dixon had control of his career. (*Id.* at 108–09). Plaintiff did confront Dixon about the lynching comment immediately after it occurred on November 9, 1999. (*Id.* at 132–133; Dixon Depo. at 103–04). Two weeks later, on November 22, 1999, Plaintiff decided to report the lynching comment to the district manager, Steve Leake. (Pl.'s Depo. at 110). By phoning Leake, Plaintiff pursued Defendant's "open door" policy, which allows any employee to report or discuss problems with any member of management. Plaintiff claims he also attempted to report the gun comment in that conversation, but Leake cut him off. (*Id.* at 179).[6] In response to Plaintiff's complaint, Leake called a meeting with Dixon, Plaintiff, Mulack, and two other assistant managers, Faye Bishop and Al Landi, who confirmed that Dixon made some comment related to blacks in the 1930s. (*Id.* at 185, 187; Bishop Depo. at 21; Mulack Depo. at 43). At that meeting, Dixon apologized to Plaintiff, who indicated he could continue to work with Dixon as long as he was reassured that he would not suffer retaliation for using the open door policy. (Pl.'s Depo. at 189–190; Dixon Depo. at 55). For making the comment, Leake gave Dixon a verbal warning.[7] (Dixon Depo. at 28;

---

2. This was the only physical contact Dixon made with Plaintiff. (Pl.'s Depo. at 265, 279–80).

3. This comment apparently referenced the movie entitled "Jungle Fever."

4. Mulack testified that he had a ringing in his ear and thus could not hear well. (Mulack Depo. at 33). Assistant Manager Faye Bishop also said people were talking back and forth during the video. (Bishop Depo. at 16).

5. Plaintiff says Graves heard Dixon call him homeboy and that everyone at the store heard Dixon call him brother. (Pl.'s Depo. at 283). Plaintiff admits however that he never complained about these names. (*Id.* at 285).

6. Plaintiff also claims he reported the gun comment to Mulack in late December 1999 and to Emmanuel on January 11, 2000. (Pl.s' Depo. at 111–112). Mulack does not recall this. (Mulack Depo. at 27).

7. According to Plaintiff, the process of discipline at Wal–Mart begins with a verbal reprimand. A written reprimand is the second step. The third step is a second written repri-

Mulack Depo. at 50). Plaintiff claims he did not know what discipline Leake gave Dixon. (Pl.'s Depo. at 191). Importantly, Plaintiff alleges no race-related comments after this disciplinary meeting, except the comment about "Jungle Fever."

Plaintiff alleges that in the days and weeks following the disciplinary meeting, Dixon retaliated against Plaintiff. Specifically, Plaintiff claims that Dixon verbally reprimanded him several times for things Dixon did not reprimand other similarly situated employees. (*Id.* at 151, 160–61). For example, Dixon reprimanded Plaintiff for leaving a back door open around December 9, 1999, in violation of store policy (*id.* at 158–61); for being too stern with an employee (*id.* at 161–62); and for failing to rewind a security tape (*id.* at 170). In addition, Plaintiff claims retaliation because he was called in to work on one of his days off in October 1999 (*id.* at 173–75), and for being singled out by Dixon for getting more "notes" or work assignments. (*Id.* at 149–50).[8] In addition, around January 7, 2000, Mulack allegedly retaliated against Plaintiff by verbally reprimanding him (*id.* at 158), forcing him to restock the dairy department—a task not typically assigned to an assistant manager—and then continually asking Plaintiff if he was 25, 50, or 75 percent finished. (*Id.* at 85–87). Mulack apparently stated, "you look like a whipped dog . . . you've got your head hung low." (*Id.* at 196–98). Plaintiff admits he did not complain about this particular remark (Pl.'s Opp'n at 5), but Plaintiff did complain to Bishop and co-manager Paul McAndrews that he felt he was being treated unfairly. (Bishop Depo. at 26, 33; McAndrews Depo. at 109).

Further, Plaintiff claims he suffered retaliation when, on his February 2000 evaluation, the Port Orange management gave him a score of "meets expectations" rather than the "exceeds expectations" he felt he deserved. (Pl.'s Answer to Interrog. No. 6 at "Approximately 1/27/00"). Plaintiff claims the evaluation rating impacted his promotability to co-manager. (Pl.'s Depo. at 273).

At Port Orange, Plaintiff says he felt as if he was "walking on eggshells" and suffered from pain in his stomach. (*Id.* at 204). Plaintiff decided to continue up the chain of management and report the retaliatory behavior via the open door policy. (*Id.* at 202). Thus, on January 11, 2000, Plaintiff phoned Regional Manager Arthur Emmanuel, who in turn called in Regional Personnel Manager Steve Schultheis to listen to the conversation. (*Id.* at 204). After Emmanuel and Schultheis heard Plaintiff's complaint regarding the lynching comment and the subsequent treatment, Emmanuel said, "we are going to get you out of that store immediately." (*Id.* at 205; Emmanuel Depo. at 54). When Emmanuel said he would transfer Plaintiff to the Ormond Beach location, Plaintiff allegedly told Emmanuel that a transfer to Ormond Beach was like "taking me out of the fire and putting me into the frying pan," because the Ormond Beach store manger, Brad Bower, was a friend and former co-worker of Ron Dixon. (*Id.* at 206). Thus, Emmanuel agreed that the Ormond Beach placement would be temporary until he could be permanently transferred to Melbourne or another location close to home, (*id.* at 206–209), even though Melbourne was not within Emman-

---

mand, known as "decision day" in which the employee must decide if he still wants to work for Wal–Mart. (Pl.'s Depo. at 158). Of course the fourth and most serious step is termination. Plaintiff testified that half of him wanted Dixon fired but then he realized

that Dixon had kids, and thus ultimately he did not want Dixon to be fired. (*Id.* at 193).

**8.** Plaintiff told Mulack about the verbal reprimands from Dixon, to which Mulack replied he would watch Dixon. (Pl.'s Depo. at 164).

uel's jurisdiction. Emmanuel also determined that Leake's verbal reprimand of Dixon for the lynching comment was an insufficient punishment and thus directed Leake to issue a written reprimand (Schultheis Depo. at 55; Dixon Depo. at 52).[9]

Plaintiff transferred to Ormond Beach the next day, on January 12, 2000. (Pl.'s Depo. at 211). He retained his benefits package, salary, and job title (id. at 213–214), but he claims that the transfer resulted in different responsibilities. (Id. at 214). Plaintiff also claims that Ormond Beach had a "morale problem" and lower sales profits than Port Orange, resulting in a smaller shareholder bonus. (Pl.'s Opp'n at 6). Plaintiff also claims that once at Ormond Beach, Bower retaliated against him first by assigning him to supervise only two departments as opposed to an entire area (Pl.'s Depo. at 216–217) and second by giving him excessive notes. (Id. at 227).

Plaintiff also claims discriminatory treatment because no one followed through with his transfer request. Plaintiff spoke to Ralph Kirchoff about the delay but was informed he would not be transferred until his two departments were cleaned up. (Id. at 228). Plaintiff then called Schultheis, who said they were working on it but that there were no openings available yet. (Id. at 233). Plaintiff was unsatisfied with Schultheis answer so he tried to contact Coleman Peterson, Vice President for the People Division, and left a message. (Id. at 236). Although Peterson did not return his phone call, Shultheis did, and reiterated that they were doing everything they could to transfer him to his choice locale. (Id. at 236–37). Shultheis further told him

that although the Melbourne area already was overstaffed, he would have priority to transfer there. (Schultheis Depo. at 74). Schultheis asked Plaintiff to be patient, and Plaintiff responded "okay." (Pl.'s Depo. at 237). Plaintiff made no other attempt to contact a member of management after those phone calls. (Id. at 238).

On March 14, 2000, Plaintiff turned in his letter of resignation, effective March 29, 2000. (Def.'s Exh. 6 to Mot. For Summ. J.).[10] In response, on March 21, 2000, Greg Lee from corporate headquarters came to Plaintiff's store. He tried to convince Plaintiff to stay at Wal–Mart, asking if another transfer would change Plaintiff's mind. (Pl.s' Depo. at 248–251). Plaintiff also spoke with Nagy around March 31—April 1, 2000. (Id. at 259). Nagy asked Plaintiff to reconsider and offered to transfer Plaintiff to the location of his choice. (Id. at 160). Plaintiff admits that the Nagy phone call made him feel better but ultimately he rejected the offer and went through with his resignation. (Id. at 261–62).

Plaintiff thus filed an amended complaint alleging the following: 1) race discrimination in violation of Title VII, 42 U.S.C. § 1981, and the Florida Civil Rights Act ("FCRA"); 2) retaliation in violation of Title VII, 42 U.S.C. § 1981, and the FCRA; and 3) assault. Specifically, Plaintiff stated that he was "constantly discriminated against and constantly harassed" because of his race; experienced dissimilar treatment from non-African-American employees; was "subjected to derogatory comments," suffered retaliation; and thereafter was "constructively

---

9. Plaintiff implies that the notation of "possible litigation/legal issues" on Dixon's written reprimand suggests something relevant to the merits of this case. Referencing possible future litigation on an employee's reprimand does not bear on this Court's decision.

10. Plaintiff retained counsel for this action before he turned in his letter of resignation, and admits that counsel had "a lot" to do with the writing of the letter. (Pl.'s Depo. at 241–42).

terminated on or around March 29, 2000." (Compl. at ¶¶ 8, 9, 11, 12, 13).

Defendant has moved for summary judgment, claiming that Plaintiff has not presented sufficient evidence to establish a prima case of racial harassment, racial discrimination, or retaliation. Moreover, Defendant claims it is entitled to judgment as a matter of law for the claim of assault.

## II. Standard of Review

A party is entitled to judgment as a matter of law when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment should be entered only when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). Summary judgment is mandated when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden on the non-moving party is not a heavy one; that party must show "specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." Wright & Miller, *Federal Practice and Procedure* § 2727 (1998) (citing cases). It is the obligation of the non-moving party, however, not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment: Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (internal quotations and citation omitted). *See also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact"). In considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in favor of the non-moving party. *HCA Health Services of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir.2001).

In *Earley v. Champion International Corp.*, 907 F.2d 1077 (11th Cir.1990), the court recognized that the summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Id.* at 1080 (citing *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548). To avoid summary judgment, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In employment discrimination cases, the Eleventh Circuit said that summary judgment motions are appropriate despite the usual presentation of facts-laden issues in order to "police the baseline for hostile environment claims." *Hansen v. Perry Tech., Inc.*, 206 F.Supp.2d 1223, 1225 (S.D.Fla.2002) (citing *Mendoza v. Borden,*

*Inc.,* 195 F.3d 1238, 1244 (11th Cir.1999) (en banc)).

## III. Analysis

### A. Hostile Work Environment

Title VII[11] of the Civil Rights Act of 1964 prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Defendant claims that Plaintiff has failed to establish his prima facie case of racially hostile work environment because: 1) Plaintiff never objected to any of the comments at the time they were made; 2) of the five race-related comments (not including the name-calling) made, only two were more than merely offensive, and two comments do not create a hostile environment; and 3) the comments did not affect Plaintiff's work performance.

#### 1. Prima Facie Case

■ To show hostile work environment, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic; and 4) the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the terms or conditions of employment and to create an

abusive working environment. *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir.2002); *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Plaintiff also must show the employer is either directly or vicariously liable for the abusive environment. *Miller,* 277 F.3d at 1275.

■ Here, Plaintiff, as an African–American, is a member of a protected group. Further, he has presented sufficient evidence to show he was subjected to unwelcome, race-related harassment. The viability of the claim, therefore, turns on the fourth element—whether the discrimination was severe or pervasive. To satisfy the fourth element, Plaintiff must prove that: 1) he subjectively perceived the conduct to be abusive, and 2) a reasonable person[12] objectively would find the conduct at issue hostile or abusive. *Id.,* at 1276 (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367).

#### (a) Subjective Inquiry

To determine whether a plaintiff subjectively felt harassed, a court may look to see if the employee quit, regularly avoided the workplace, reacted angrily to the alleged comments/acts, or exhibited some physical or psychological reaction to the environment. *Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1272–73 (7th Cir. 1991).[13]

11. In addition to Title VII, Plaintiff brings claims of discrimination under section 1981 of Title 42 and under the FCRA. Because the law construes all three statutes the same way, the Court will limit its discussion to the Title VII claims with the understanding that its analysis also applies to the § 1981 and FCRA claims. *MacLean v. City of St. Petersburg,* 194 F.Supp.2d 1290, 1301 (M.D.Fla.2002) (FCRA patterned after Title VII, so decisions construing Title VII apply to FCRA claims); *Hansen,* 206 F.Supp.2d 1223, 1231 (Title VII analysis applies to § 1981 claims).

12. The "reasonable person" in this situation should be one "in plaintiff's position." *Hansen,* 206 F.Supp.2d at 1232 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

13. The Court notes that *Daniels* has limited precedent to employment discrimination claims in this Circuit. First, it is a Seventh Circuit decision. Second, it dates back to 1991, several years prior to the Supreme Court's more definitive jurisprudence on such claims.

■ The Court finds that Plaintiff has presented thin but sufficient evidence that he subjectively perceived the conduct at issue to be abusive. Although he did not voice his objections directly to the main offender (Dixon) except once or twice, he did eventually report to Leake at least the lynching comment, and he attempted to report the gun comment. Plaintiff also reported the retaliation to Emmanuel, which resulted in his transfer to Ormond Beach.[14] These two reports establish subjective feelings of harassment for at least some of the comments made at Port Orange. Also, Plaintiff resigned, adding to the evidence that he felt abused.

The question remains, however, whether Plaintiff has presented sufficient proof to satisfy the objective inquiry. *Ramsey v. Leath,* 706 F.2d 1166, 1170 (11th Cir.1983) (affirming summary judgment in favor of appellee because appellants failed to present any evidence beyond their subjective beliefs).

**(b) Objective Inquiry**

■ In determining whether the conduct at issue objectively is hostile or abusive, a court should look at the totality of the circumstances, *Mendoza,* 195 F.3d at 1246, using several factors including: 1) the frequency of the conduct, 2) its severity, 3) whether it was physically threatening or humiliating or whether it was merely offensive, 4) whether it unreasonably interfered with the employee's job performance. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Miller,* 277 F.3d at 1276 (citing *Allen,* 121 F.3d at 647). These factors taken together must reveal conduct extreme enough to "amount to a change in terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Such a test "ensures that Title VII does not become a mere 'general civility code.'" *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 583 (11th Cir.2000) (citing *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275).

**(i) Frequency, Severity, and Level of Offensiveness**

■ Defendant argues that the Court should not consider all of the comments (which were made approximately one month apart over an eight-month period) in its frequency determination but rather only those that rise above mere offensiveness and into the realm of severity. Plaintiff argues that the Court cannot disaggregate the statements. The Court agrees with Defendant. Indeed, although the Court must examine the statements collectively to determine if they are severe or pervasive, the Court may not consider in its collection "[i]nnocuous statements or conduct, or boorish ones" that are not related to race. *Id.,* at 583.

■ To determine which statements are boorish but not severe, a court must make both a subjective and objective inquiry. *Id.* at 586 (citing *Mendoza,* 195 F.3d at 1246). To be actionable, a statement must appear both to the plaintiff and to a reasonable person as physically intimidating or humiliating. *Miller,* 277 F.3d at 1277; *Hansen,* 206 F.Supp.2d at 1232–33. In *Miller,* for example, the court held that the derogatory names used—including "Spic," "Wetback," and "Mexican Mother F------"—were severe because the plaintiff "did not suffer from overhearing occasion-

---

**14.** Plaintiff here alleges a psychological and physical reaction to his environment by claiming he was walking on eggshells and felt pain in his stomach. However, Plaintiff only claimed to feel these symptoms at Port Orange. When he complained to Emmanuel about the treatment at Port Orange, he was transferred, thereby effectively removing him from the environment that made him feel ill.

al off-color comments. Rather, ... [co-workers] used the derogatory names in an intimidating manner, shouting them at Miller during the course of berating him for his job performance, or when they were 'arguing with him,' were 'mad with him,' or were 'taunting him.'" *Miller*, 277 F.3d at 1277. Like the plaintiff in *Miller*, Plaintiff here did not merely overhear Dixon's off-color comments. However, unlike the plaintiff in *Miller*, Plaintiff here did not suffer derogatory name-calling in an intimidating manner. Dixon did not shout the epithets or use them to berate or taunt Plaintiff.

█ Indeed, in the instant case, most of the comments,[15] while certainly offensive, do not rise to the level of severity required for Title VII. *Harris*, 510 U.S. at 21, 114 S.Ct. 367. The comment warning Plaintiff about the police in Port Orange is race-related but not severe, as no reasonable person would conclude that Dixon was taunting or intimidating Plaintiff just by commenting on a former employee's experience in that town. The comment regarding sleeping with a black woman who was "aggressive" also is race-related but, while it is certainly off color, no reasonable person could see it as intimidating or humiliating to Plaintiff. The comment regarding "Jungle Fever" is related to race but Dixon was speaking of Mulack's daughter, not about Plaintiff. The name-calling, especially use of "brother" on a daily basis, could be construed as race-related.[16] However, the undisputed evidence shows that Dixon also called Mulack, Landi, and

other non-African-Americans "brother." (Dixon Depo. at 92). Hence, the name is not being used in a race-related manner in this circumstance.[17]

The only two comments that a reasonable person could consider as intimidating or berating are the lynching and the gun comments. The lynching comment was used to berate and intimidate Plaintiff for his work-related phototaking.[18] Similarly, a reasonable person could view the gun comment as intimidating because Dixon said, while patting Plaintiff on the back, that he used guns like the one missing from the store to shoot blacks. Notably, Plaintiff's own actions mirror the Court's finding that only these two comments are severe, for these are the only two comments that Plaintiff reported to management. (Pl.s' Depo. at 118).

█ Based on these two comments (and possibly the "homeboy" and "boy" name-calling), the Court finds that frequency has not been shown. While there is no magic number for frequency, "repeated incidents of verbal harassment that continue despite the employee's objections" would satisfy the test. *Miller*, 277 F.3d at 1276 (quoting with approval *Shanoff v. Illinois Dep't of Human Serv.*, 258 F.3d 696, 704 (7th Cir. 2001)). In *Hansen*, for example, the court held that frequency was shown because the plaintiff suffered name-calling and comments "routinely." Even when the comments decreased, that plaintiff heard them two to four times a day. *Hansen*, 206 F.Supp.2d at 1227 n. 3. Similarly, the

---

**15.** Dixon denies making all comments except the lynching comment and the various name-calling. (Dixon Depo. at 33–34, 47, 70, 83, 85–86). On a motion for summary judgment, however, the Court must view the evidence in a light most favorable to the non-moving party.

**16.** Plaintiff admitted that he did not complain about Dixon's calling him homeboy and boy.

**17.** Although Plaintiff says he took Mulack's alleged comment about looking a "whipped dog" as taunting, the comment is not race-related and therefore will not be considered.

**18.** Dixon claims he was "joking" when he made the comment. (Dixon Depo. at 19). Others claim they took it as a joke too. (*See, e.g.*, Bishop Depo. at 16).

*Miller* court found that frequency and permeation were satisfied when ethnic slurs were "hurled" at plaintiff three to four times a day. 277 F.3d at 1276. *Hansen* and *Miller* therefore contrast with the situation here, where, even considering all of the comments, Dixon made comments and called Plaintiff names only sporadically over the course of eight months. Plaintiff has not shown repeated incidents of harassing behavior to indicate to this Court that abuse *permeated* the workplace. *Hansen,* 206 F.Supp.2d at 1231 (noting that the Eleventh Circuit's choice of the word "permeated" in *Miller* "connotes significantly more than many other adjectives."). Moreover, Plaintiff does not refute that after he objected to Dixon's lynching comment, the offensive comments toward Plaintiff ceased.[19]

### (ii) Alteration of Working Conditions

 Defendant argues that Plaintiff's working conditions were not significantly altered, thus precluding Plaintiff from making out a prima facie case of hostile environment. To show alteration of job performance, a plaintiff need not show tangible effects such as economic harm. *Miller,* 277 F.3d at 1277. However, the plaintiff must show some material alteration[20] of job performance from a reasonable person's standpoint. *Gupta,* 212 F.3d at 586. In this case, a reasonable person might have viewed the lynching comment as one that altered Plaintiff's

work conditions. By making his comment, Dixon intended to proscribe Plaintiff from performing work that would attract the positive attention of Defendant's corporate officers. Plaintiff, however, presented no evidence that he ceased performing the work that attracted corporate attention or that his work was affected at all by that comment, the gun comment, or the name-calling.[21] In fact, Plaintiff claims that his job performance was stellar enough to merit a higher evaluation than the one given. Mere utterance of a racial epithet that engenders offensive feelings in an employee but does not alter the conditions of employment does not present an actionable situation under Title VII. *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (citing *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Gupta,* 212 F.3d at 586 (noting in a sexual harassment case that litigation of merely bothersome and uncomfortable conduct risks lowering the bar of Title VII and trivializing truly actionable instances of harassment).

For all these reasons, the Court therefore agrees with Defendant that Plaintiff has failed to present sufficient evidence to establish a hostile work environment.

### 2. *Faragher–Ellerth* Defense

Assuming *arguendo* that the evidence supported a prima facie case, Plaintiff's race discrimination claim cannot go for-

---

**19.** The only comment that followed Plaintiff's November 22 report to Leake was the "Jungle Fever" comment, and as discussed above, this comment was in no way related to or directed at Plaintiff, even though Plaintiff may have been the only African–American in the room at the time.

**20.** It is implied that the plaintiff must show some *negative* alteration of job performance, for a showing of positive alteration would not indicate a hostile environment. *See, e.g., Hansen,* 206 F.Supp.2d at 1233–34 (pay raise

revealed in part that the offensive comments did not unreasonably interfere with job performance).

**21.** Plaintiff testified that he felt as if he was walking on eggshells and suffered pain in his stomach while working at Port Orange. These sick feelings could potentially alter one's working conditions. However, Plaintiff has not presented any evidence that the pain or sick feelings altered his work performance in any overt way or prevented him from attending work.

ward because Defendant has satisfied the affirmative *Faragher–Ellerth* defense. According to the Supreme Court, if a plaintiff shows that the supervisor effected a tangible employment action against plaintiff, then the corporate defendant is liable for the harassment. *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Miller,* 277 F.3d at 1278. Where, however, the plaintiff does not show that the supervisor took a tangible employment action, the employer may raise an affirmative defense that it: 1) exercised reasonable care to prevent and promptly correct the harassing behavior, and 2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities the employer provided or to avoid harm otherwise. *Miller,* 277 F.3d at 1278 (citing *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275); *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

### (a) Tangible Employment Action

■ In the instant case, no tangible employment action has been taken. "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257 (emphases added). The only factor from *Ellerth* that potentially applies here is Plaintiff's reassignment to Ormond Beach. Although Plaintiff's duties changed at Ormond Beach, the changes were not *significant.* Indeed, Plaintiff's salary, benefits, and title remained the same. Further, just as in *Hansen,* the Defendant here has put forth the legitimate business reason that assign-

ment of duties varies widely based on each store's needs. For a more in-depth discussion of Defendant's legitimate business reasons, *see infra* Part III(B). Because Defendant did not take a tangible employment action against Plaintiff, it may assert its affirmative defense under *Faragher–Ellerth.*

### (b) Reasonable Care to Prevent

■ First, Defendant argues it exercised reasonable care to prevent harassing behavior by having in place an open door policy, of which Plaintiff not only was aware, (Pl.'s Depo. at 61), but used. The Court agrees with Defendant. Indeed, Defendant's open door policy allowed Plaintiff as an employee to contact any member of management to report his problem. This policy, therefore, provided an effective, reasonable means[22] for preventing harassing behavior. Because Plaintiff knew and made use of that policy, the first element of Defendant's affirmative defense is satisfied.

### (c) Prompt Corrective Action

Defendant then claims that when Plaintiff used the policy, it acted promptly to correct the reported offensive behavior. Plaintiff claims, however, that Defendant did not act promptly. Specifically, Plaintiff claims that Defendant's discrimination began on Plaintiff's first day of work, May 16–17, 1999, and that it continued until December 1999. Although Plaintiff has presented evidence that the offensive behavior began in the spring of 1999, Plaintiff has not shown sufficient evidence that he gave Defendant notice of the behavior until November 1999. The Court will

---

**22.** Unlike the inadequate sexual harassment grievance procedure in *Meritor,* which required the employee to complain first to the supervisor who was, in that case, the alleged perpetrator, 477 U.S. at 72, 106 S.Ct. 2399, the policy in this case allowed Plaintiff to report his problems to any member of management, therefore avoiding the quandary of having to complain to the offending supervisor.

measure Defendant's promptness and corrective action from the date it first became aware of the offensive comments, November 22, 1999.[23]

Leake commenced an investigation on the first day after his report that Plaintiff was back at work—November 24. This was a mere two days after Plaintiff's complaint and thus is a prompt response. "[A]n employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Hansen*, 206 F.Supp.2d at 1236 (quoting *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001)) (internal quotations removed).

In addition, Defendant here took action to correct the behavior. Following the investigation, which revealed that Dixon had indeed made the lynching comment, Leake gave Dixon a verbal reprimand. In addition, Dixon apologized to Plaintiff, and Plaintiff accepted. "The employer need not take all possible methods to remedy the harassment once it is put on notice, rather the remedial action must be reasonably likely to prevent the misconduct from recurring." *Hansen*, 206 F.Supp.2d at

1236 (internal quotations and citations omitted).[24] Following this meeting and Dixon's verbal reprimand, the undisputed evidence confirms that Dixon ceased making inappropriate race-related comments to Plaintiff. Hence, not only was Defendant's action reasonably likely to correct the situation but in fact it indeed did correct the harassing behavior of which Plaintiff complained.

Plaintiff asserts that Emmanuel's act of calling Schultheis into his office should give rise to the inference that Emmanuel had "prior knowledge of the incidents." (Pl.'s Opp'n at 5). Without more, the Court will not make this leap in logic. Calling a fellow manager into one's office to listen to a phone call in which an employee wants to make allegations of a serious nature does not by itself suggest prior knowledge of those allegations.

Plaintiff also suggests that because no one reported to him the exact discipline taken against Dixon in supposed contravention of Wal–Mart's Employee Handbook, that Defendant is somehow precluded from asserting its affirmative defense. (Pl.'s Opp'n at 13). The Court finds that

**23.** Plaintiff complained about the comment to District Manager Steve Leake on November 22, 1999, even though the comment was made two weeks earlier, on November 9. Plaintiff claims that because Bishop heard the comment at the meeting but failed to report it, the employer should have known of the harassment. Plaintiff also insinuates that Mulack should have heard the comment because, despite his ear ache, he heard everything else at the meeting. Even if others did hear the comment, however, Plaintiff reported the offensive comment himself, mooting analysis of whether Bishop and/or Mulack's knowledge of the comment would have served as constructive knowledge for Defendant.

Indeed, it is notable that the only comments or actions that other employees claimed to have knowledge of are the same comments/actions that Plaintiff himself reported. Federal law cannot help to correct the prob-

lem of workplace discrimination "without the cooperation of the victims, notwithstanding that it may be difficult for them to make such efforts. . . . an employee must provide adequate notice that the employer's directives have been breached so that the employer has the opportunity to correct the problem." *Hansen*, 206 F.Supp.2d at 1236 n. 20 (citing *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir.1999)).

**24.** Even though some managers testified that they would have terminated Dixon on the spot for the comment, the uncontroverted evidence indicates that Plaintiff said he did not want anything to happen to Dixon, such as termination. (Dixon Depo. at 27). Indeed, Plaintiff did not even want to change departments, (Mulack Depo. at 54), but rather Plaintiff agreed he could continuing working with Dixon as long as there were assurances that no one would retaliate against him.

Defendant's failure to fully inform Plaintiff and failure to implement internal policies to the letter neither prevents Defendant from affirmatively defending itself, nor undoes Defendant's prompt corrective action. Just as the Eleventh Circuit announced it would not sit as a super-personnel department in *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991), this Court also will not reexamine how Defendant's management chose to implement its internal policies. 939 F.2d at 1470 (quoting with approval *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir. 1988)).

Moreover, Defendant here put forth a legitimate business reason not to fully inform Plaintiff: Dixon's right to confidentiality. (Emmanuel Depo. at 102; Nagy Depo. at 33). Defendant told Plaintiff enough to satisfy him to continue working with Dixon, and this Court will not require more of the employer.

The Court notes that Defendant continued to take prompt, corrective action when Plaintiff complained about retaliation at Port Orange. Defendant immediately (on the same day) effectuated a transfer of Plaintiff out of the Port Orange location to a temporary new location. Certainly a transfer out of the store in which the retaliatory conduct takes place is reasonably likely to correct the retaliation.[25]

Even when Plaintiff filed his letter of resignation, Defendant tried to take prompt corrective action.[26] Almost immediately upon receipt of that letter, Nagy phoned Plaintiff because he saw talent in Plaintiff and wanted him to stay with the company. (Nagy Depo at 52–53). Both Nagy and Lee offered to place Plaintiff anywhere. Offers to re-transfer presents reasonable attempts to correct any retaliation[27] experienced at Ormond Beach.

For the reasons outlined above, the Court finds in Defendant's favor as to the hostile work environment count.

### B. Adverse Employment Action

Defendant also urges summary judgment in its favor because Plaintiff has failed to show he suffered an adverse employment action as required for a race discrimination claim.

For an employment action to be adverse, the terms or conditions of employment must be seriously and materially altered. *Davis,* 245 F.3d at 1239. The test for determining adversity of an employment action is whether a reasonable person in plaintiff's position would view the action as adverse. *Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1448–1449 (11th Cir.1998) (noting that no court has explicitly relied on a plaintiff's subjective preferences to find an employment

25. Plaintiff implies that the transfer was just another part of Defendant's retaliatory treatment and that he continued to experience retaliation at the Ormond Beach store. Hence, Plaintiff argues, the action was not corrective. The record shows, however, that transfers of assistant managers happened "all the time," (Bishop Depo at 33), and that Plaintiff acquiesced to his temporary transfer. In addition, the record presents no set of facts upon which a jury could find retaliation at Ormond Beach.

26. Plaintiff argues that he again attempted to use the open door policy to complain about

the retaliation at Ormond Beach by phoning Schultheis and then Coleman Peterson. However, Plaintiff admits that, in response to Schultheis's request that Plaintiff remain patient for the permanent transfer, Plaintiff said "okay." Plaintiff also admits that he did not contact any other member of management between those phone calls and the filing of his resignation letter.

27. The Court notes that Plaintiff did not complain to anyone about the retaliation at Ormond Beach but only about the delay in his permanent transfer.

action adverse); *Greene v. Loewenstein, Inc.*, 99 F.Supp.2d 1373, 1381–82 (S.D.Fla. 2000). An employment action is not adverse merely because the employee dislikes or disagrees with it. *MacLean v. City of St. Petersburg*, 194 F.Supp.2d 1290, 1298 (M.D.Fla.2002) (reminding that Title VII's protections do not extend to everything an employee finds displeasurable). Rather, a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Graham v. Fla. Dep't of Corrections*, 1 F.Supp.2d 1445, 1449 (M.D.Fla.1998) (citation omitted).

Plaintiff here claims he suffered adverse employment action due to the following events: 1) subjection to reprimands that similarly situated non-black employees did not receive; 2) transfer to a store with a lower business volume; 3) responsibility for fewer departments at the transfer store than at the previous store; 4) being rated at a level lower than warranted, thereby precluding a high raise; and 5) harassment to the point of constructive discharge. The Court finds that none of these events have been substantiated as adverse.

First, there is insufficient evidence to show that Plaintiff was subjected to reprimands where other similarly situated employees were not. Although Plaintiff has testified about receiving verbal reprimands from Dixon and Mulack, Plaintiff has not submitted evidence beyond his conclusory allegations that other assistant managers were not reprimanded for the same things.[28]

 Second, the transfer to Ormond Beach from Port Orange might have been undesirable from Plaintiff's point of view, but "plaintiff's unhappiness with the reassignment does not make the reassignment adverse." *Graham*, 1 F.Supp.2d at 1450. Indeed, the employee's subjective view of an employer's action does not control. *MacLean*, 194 F.Supp.2d at 1298. A disadvantageous transfer can be considered adverse, but only if the adversity is more than de minimus inconvenience or alteration of responsibilities. *Greene*, 99 F.Supp.2d at 1382 (quotations and citations removed). The transfer here was not adverse because lower sales volume is speculative. Although there is evidence to support Plaintiff's assertion that the store was perceived to have lower profit potential at the time of the transfer, hence resulting in a lower bonus for employees, (McAndrews Depo. at 59 and 107; Mulack Depo. at 16 [29] ), the sales, profits, and productivity could have changed over the course of the year. Even if the store's lower productivity would have lessened Plaintiff's bonus,[30] which again is speculative, the lessening would have been de minimus. Indeed, the bonus accounts for only one percent of a Wal–Mart employee's total annual monetary compensation. (Garland Decl. at ¶ 10). Moreover, Plaintiff resigned before he became entitled to his bonus. (*Id.* at ¶ 12).

---

28. Dixon, for example, testified he had similarly reprimanded other employees who did the same thing. (Dixon Depo. at 130–31).

29. Mulack agreed that the productivity of the entire store affected compensation in 1999.

30. According to the Declaration of Business Analyst/Compensation Manager Cindy Garland, "Bonus eligibility is determined based upon the profitability of an individual store at the end of the fiscal year." (Garland Decl. at ¶ 6). The fiscal year runs from February 1 until January 31 of the following year. (*Id.* at ¶ 7).

Third, the transfer from Port Orange to Ormond Beach did not result in a demotion. Plaintiff admits that his salary, title, and benefits did not change upon being transferred. Plaintiff argues however that his responsibilities changed primarily because he was assigned to manage two departments as opposed to six or eight. The Court does not accept this change in responsibilities as an adverse employment action. As Emmanuel testified, an assistant manager is a managerial, salaried position (Emmanuel Depo. at 97), and Plaintiff's salary remained the same. Also, even if an assistant manger only oversaw two departments, he would have other responsibilities that department managers do not have. (Emmanuel Depo. at 97).

More importantly, the needs of each store vary widely (Emmanuel Depo. at 65; McAndrews Depo. at 62), and this Court will not sit in judgment of the business decisions of Defendant's various store managers. Even if, as Bower admits, the two departments were "the worst" in the store (Bower Depo. at 49), a reasonable person would see the assignment as reflective of the needs of that particular store at that particular time.[31] Indeed, at that time, a new competitive store was opening across the street from the Ormond Beach Wal–Mart.[32] (Bower Depo. at 45). Moreover, whereas a typical supercenter [33] usually has four areas with one assistant manager per area, the Ormond Beach store already had six assistant managers at the time of Plaintiff's transfer. This evidence suggests the reasonable conclusion that they were overstaffed at Ormond Beach. (Bower Depo at 37).[34] Just as the *Gupta* court held that "[a] university can assign its professors to teach the classes it needs them to teach[,]" 212 F.3d at 588, so too will this Court hold that a store can assign its employees to oversee the departments it needs them to oversee. Work assignment claims "strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Hansen*, 206 F.Supp.2d at 1235 (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir.2001)). "In the vast majority of instances, however, we think an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause—especially where, as here, the work assignment at issue is only . . . temporary and does not affect the employee's permanent job title or classification." *Davis*, 245 F.3d at 1245. Because the transfer is lateral, it is not actionable as adverse. *Greene*, 99 F.Supp.2d at 1382 (citing *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996) for the proposition that a transfer involving no demotion in form or substance does not rise to the level of materially adverse employment action).

 Fourth, Plaintiff's claim that his undeserved negative evaluation constitutes

**31.** Notably, Defendant did not reduce the number of departments Plaintiff oversaw at the *same* store but rather at two different stores at two different locations.

**32.** Bower testified that he had no knowledge of Plaintiff's strengths or weaknesses at the time he assigned him to two departments, but Bower also testified that the needs of the store merited placing Plaintiff in those departments. (Bower Depo. at 54–55).

**33.** Mulack testified that both Port Orange and Ormond Beach were supercenters during the relevant time period. (Mulack Depo. at 113).

**34.** In fact, when Mulack was an assistant manager, and the store was overstaffed with approximately eight or nine assistant managers, he too supervised only two departments. (Mulack Depo. at 78–79).

**1332**

an adverse employment action for purposes of race discrimination is misplaced. Plaintiff claims that he should not have received a 3.4 ("meets expectations") but rather a 3.8 ("exceeds expectations") in large part because Leake ranked Plaintiff as a better assistant manager than Robert Teeter, who received a 3.8 on his annual evaluation. (Pl.'s Opp'n at 15). Although a higher evaluation may lead to a promotion or bigger raise, (Bishop Depo. at 36; Mulack Depo. at 23), the Court will not adjudge the actionability of an employee evaluation here. *Davis*, 245 F.3d at 1242 n. 3 ("Although we remarked in dicta [in *Graham* ] that 'undeserved negative job evaluations' may be actionable under Title VII's retaliation clause, *Graham* did not address Title VII's anti-discrimination clause.").

Moreover, even if an undeserved negative evaluation was actionable here, Plaintiff has not submitted sufficient evidence to show the review was negative or undeserved. A review of "meets expectations" is hardly a poor evaluation. Even if Plaintiff perceived it as negative, "[an] employee who receives . . . a negative evaluation may lose self-esteem and conceivably may suffer a loss of prestige in the eyes of others who come to be aware of the evaluation. But the protections of Title VII simply do not extend to everything that makes an employee unhappy." *Davis*, 245 F.3d at 1242 (internal citations and quotations omitted). In addition, nothing in the record suggests that Plaintiff's performance was anything more than average, according to those who evaluated him.[35]

"Employer criticism . . . is an ordinary and appropriate feature of the workplace." *Davis*, 245 F.3d at 1242. Like *Davis*, this Court will not second-guess employer feedback. *Id.*

The Court also is not swayed by the argument that Plaintiff's evaluation was adverse by Plaintiff's assertion that Mulack told Paul McAndrews to conform Plaintiff's evaluation to a 3.4 (meets expectations).[36] Although McAndrews testified that the number on the evaluation "had to have come from the store manager"[37] (McAndrews Depo. at 68), Plaintiff has not shown evidence to refute the notion that he deserved anything more than a 3.4 evaluation. The Court will not draw the inference that there was some devious intent to stymie a promotion or raise by lowering Plaintiff's evaluation merely because Plaintiff asserts that his job performance was better than average.

■ Fifth, Plaintiff has not submitted sufficient evidence for a jury to find harassment to the point of constructive discharge. For example, the comment by Mulack regarding "are you 25 percent done?" does not constitute harassment of the level Title VII intended to remedy. Moreover, when Dixon reprimanded Plaintiff for leaving a door open in violation of store policy, that was not harassment. Plaintiff suggests that Dixon was trying to get Plaintiff in trouble by scolding him. If in fact Dixon wanted to get Plaintiff in trouble for this violation, he would have reported it to Mulack. The opposite happened. In fact, it was Plaintiff, not Dixon,

---

**35.** Mulack called Plaintiff's performance "average" (Mulack Depo. at 15) and informed Plaintiff that his skills did not exceed expectations in his supervision, merchandising, and knowledge of operations. (*Id.* at 84, 108).

**36.** Mulack denies ordering McAndrews to give Plaintiff a 3.4 evaluation. (Mulack Depo. at 82).

**37.** Plaintiff's argument that Leake thought Plaintiff was a better assistant manager than Teeter does not bear on the Court's decision. Leake had no part in the evaluation process. The store manager (Mulack) and the co-managers did. The store manager here said Plaintiff's performance was average.

who brought the incident to Mulack's attention, claiming unfair treatment. In response, Mulack advised Plaintiff that Dixon's statement regarding store policy was correct and that Dixon's reprimand was therefore appropriate. (Mulack Depo. at 59).

Because there was no termination of employment (other than the Plaintiff's own resignation), no demotion as evidenced by a decrease in wage or salary, no less distinguished title, no material loss of benefits, no significant diminishing of material responsibilities, and no other indices of materially changed employment terms and conditions, the Court finds that no adverse employment action occurred. Importantly, none of the actions alleged constrained Plaintiff's career. *Dekalb County School Dist.,* 145 F.3d at 1451 n. 18 ("Under an objective standard, an employer can expect that it will not be liable for employment discrimination if it does not constrain its employees' careers."). In fact, upon reporting the retaliation, Plaintiff was told he could transfer permanently to his desired location of Melbourne or somewhere close to his home. Following Plaintiff's letter of resignation, Defendant again offered to transfer Plaintiff to any location. These actions demonstrate that, far from constraining Plaintiff's career, Defendant was attempting to further it by keeping him happy and by moving him to an environment in which he might better thrive.

Due to all the above reasons, Plaintiff has not shown he suffered an adverse employment action to prove a violation of Title's VII's race discrimination clause.

## C. Retaliation

Defendant urges summary judgment on the count of retaliation because Plaintiff has not shown he suffered an adverse employment action, and even if he has, Plaintiff cannot show that the employment actions are causally related to his statutorily protected expression of using the open door policy.

 To establish a prima facie case of retaliation, the plaintiff must show that: 1) he engaged in statutorily protected expression, 2) he suffered an adverse employment action, and 3) causal relation between the expression and the adverse employment action. *Meeks v. Computer Assoc. Int'l,* 15 F.3d 1013, 1021 (11th Cir. 1994). Although the plaintiff need not prove the underlying claim of discrimination for a retaliation action to lie, he does need to show that he suffered an adverse employment action prompted by the expression. *Gupta,* 212 F.3d at 586.

In the instant case, Plaintiff has failed to make out his prima facie case of retaliation. Although he satisfied the first element by establishing that he used Defendant's "open door policy," *MacLean,* 194 F.Supp.2d at 1297–98 (protected expression includes making a charge in an internal investigation), Plaintiff failed to satisfy the second and third elements.

First, retaliation is not shown by being called in on Plaintiff's day off. It is impossible for Defendant to retaliate against nothing. Plaintiff's supervisor called him in to work on a day in October 1999 when they were short-staffed and a hurricane was predicted. Dixon did not make the lynching comment until November 9, 1999, and Plaintiff did not report it until November 22, weeks *after* the day-off incident. The sheer timing of this event prevents Plaintiff from claiming it was a retaliatory tactic.

 Second, even though Defendant transferred Plaintiff to a store where Dixon previously worked and where Bower, who was friends with Dixon, would be store manager, the Court sees no justified reason to infer that Bower was motivated to retaliate against Plaintiff or that Plaintiff was being thrown "from the fire into

the frying pan." [38] If a person's behavior was predicted based on his friends' behavior, then no one would ever be free from negative inferences. In addition, Emmanuel offered several legitimate business reasons to transfer Plaintiff to Ormond Beach that do not in any way suggest discrimination based on race, including: 1) the store was in close proximity to Port Orange; 2) Emmanuel knew Bower personally and thought he would be a good manager for Plaintiff; 3) to get Plaintiff out of the uncomfortable atmosphere as soon as possible. (Emmanuel Depo. at 69). This Court will not reexamine Defendant's business decisions. *Davis*, 245 F.3d at 1244. In addition, Emmanuel did not even have jurisdiction to transfer Dixon to his desired choice, so he did the next best thing until a permanent transfer could be solidified through the proper regional manager. (Emmanuel Depo. at 20). *See e.g., Graham*, 1 F.Supp.2d at 1450 (finding the transfer was not adverse in part because "[a]lthough she wanted to be transferred to another location, she acknowledged that such a transfer would have been in violation of the DOC's rules and regulations.").

 Third, receipt of "excessive notes" or work assignments does not provide evidence of an adverse employment action for retaliation. This Court finds, as in *MacLean*, that an increased workload is not actionable because it is an "ordinary tribulation of the workplace." *MacLean*, 194 F.Supp.2d at 1299.[39] Plaintiff did not complain about receiving excessive notes to allow a manager to correct any wrongdoing,[40] and even if he did, Plaintiff has not shown any causal connection between the notes and the protected expression.

Any argument that Bower's employment actions were retaliatory is also untenable. When Plaintiff arrived at Ormond Beach, Bower did not know of Plaintiff's statutorily protected expression. In fact, Bower did not learn of the lynching comment nor of Plaintiff's complaint until one month after Plaintiff arrived at Ormond Beach (Bower Depo. at 66), which was approximately three weeks after Bower determined which departments Plaintiff would supervise.[41] (*Id.* at 81). Bower could not have retaliated for something about which he did not know.[42] *Brungart v. BellSouth*

38. Emmanuel denied hearing Plaintiff say the "frying pan comment," and testified that the decision to temporarily transfer was mutual. (Emmanuel Depo. at 54–57). Emmanuel testified that he would not move Plaintiff from one uncomfortable situation into another. (Emmanuel Depo. at 59). Indeed, Plaintiff has not put forth evidence of any motive for why Defendant would transfer Plaintiff to an uncomfortable situation, other than Plaintiff's conclusory allegation of retaliation.

39. The Court further notes the irreconcilable tension between Plaintiff's allegation on the one hand that he was demoted for being assigned to oversee fewer departments (i.e., less responsibility) while on the other hand alleging he suffered harassment for receiving more work assignments (i.e., more responsibility) than other assistant managers.

40. Plaintiff cannot rely on his attempted phone call to Peterson here. Plaintiff intended that call specifically to address the delay in

transfer, not the work assignments. (Pl.'s Depo. at 236–38). There is no evidence that Plaintiff made a reasonable attempt to report any subjective retaliation.

41. Plaintiff's testimony is not contradictory. He said that he was assigned to oversee just two departments "shortly" after his arrival at Ormond Beach. (Pl.'s Depo. at 216).

42. Plaintiff claims that Emmanuel told Bower about "the whole ordeal." However, Plaintiff admits that he did not know the contents of their conversation. (Pl.'s Depo. at 225).

In addition, Mulack could not have informed Bower of the reason for the transfer, for Mulack was kept on a need-to-know basis. (Mulack Depo. at 67). Mulack said he never even spoke with Bower about Plaintiff or Dixon. (*Id.* at 73).

*Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir.2000) ("a decision maker cannot have been motivated to retaliate by something unknown to him."). Based on common sense alone, Plaintiff cannot show a causal connection between Bower's actions and the protected expression.

Because the Court finds no evidence to show an adverse employment action causally related to Plaintiff's protected expression, Plaintiff's claim of retaliation fails as a matter of law.

## D. Constructive Discharge

Defendant also seeks summary judgment on the constructive discharge claim.

■ To make a claim of constructive discharge, an employee must show that working conditions were so difficult or unreasonable as to compel a reasonable person to resign. *Hill v. Winn–Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir.1991) (requiring "a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable' "); *Hansen*, 206 F.Supp.2d at 1235, n. 19; *Graham*, 1 F.Supp.2d at 1450.

■ In this case, Plaintiff claims the working conditions were so intolerable that he no longer could work for Defendant. The record does not support this claim. First, when Plaintiff reported the lynching comment to Leake, Plaintiff indicated that he could work with Dixon as long as he was guaranteed no retaliation. Thus, Plaintiff cannot claim now that Defendant should be held liable because Plaintiff secretly felt he could not in actuality work with Dixon. Second, when Plaintiff complained to Emmanuel about retaliatory tactics, Defendant transferred Plaintiff out of the allegedly intolerable Port Orange location, thereby rectifying the situation.

Third, there is no evidence in the record that Plaintiff informed Defendant the working conditions were difficult or unreasonable at Ormond Beach. Plaintiff did not report the extra work assignments or reduced departments to any member of management, nor did he mention them in his resignation letter. All Plaintiff mentioned in the letter was that Ormond Beach is a "lesser performing store" and that his transfer was unduly delayed. This is insufficient to put Defendant on notice. *MacLean*, 194 F.Supp.2d at 1300 (imposing duty on plaintiff to act reasonably to notify employer of improper behavior and affording employer an opportunity to correct it before labeling resignation as constructive discharge). The lack of transfer according to a loosely promised time frame from a lesser performing store does not indicate to this Court that work conditions were so unreasonable as to resign from the entire company.[43] Indeed, upon learning of his resignation, Defendant attempted once again to transfer Plaintiff to any area he wanted. *Hill*, 934 F.2d at 1527 (finding conditions not so intolerable to compel a reasonable person to resign, "especially in light of the short duration of time within which these events occurred and in light of [Defendant's] attempts to rectify the situation with [Plaintiff] in the two weeks following the submission of her resignation."); *Greene*, 99 F.Supp.2d at 1385 (determining that the plaintiff's claim of constructive discharge was compromised because he denied without negotiation the company's proposal to modify his compensation package). The actions taken following Plaintiff's open door report simply do not rise to the level of intolerability required for constructive discharge, and Plaintiff's failure to mitigate weighs against allowing this claim to proceed.

---

**43.** Defendant also had a legitimate business reason for the delayed transfer. Schultheis testified that the Melbourne area was over-staffed and there were no openings available yet.

### E. Assault

Defendant states that Plaintiff cannot support his assault claim with the gun and lynching comments made by Dixon because: 1) Dixon possessed no guns at the time of the gun comment nor made any physically threatening gestures to create imminent peril, and 2) there was no apparent, present ability to effectuate the lynching comment. Moreover, Defendant claims that even if Plaintiff could establish that Dixon assaulted Plaintiff, Defendant cannot be held liable because Dixon was not acting during the course of employment to further an interest of the employer.

Assault is defined in Florida as "an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." *Sullivan v. Atlantic Fed. Sav. & Loan Assoc.*, 454 So.2d 52, 54 (Fla. 4th DCA 1984) (citing *Lay v. Kremer*, 411 So.2d 1347 (Fla. 1st DCA 1982)). *See also McDonald v. Ford*, 223 So.2d 553, 555 (Fla. 2d DCA 1969) (same but adding the phrase "coupled with the apparent present ability to effectuate the attempt").

Plaintiff does not discuss assault in its opposition documents. Nevertheless, the Court finds that Plaintiff has not met its burden to show a genuine issue of material fact as to the assault count. No reasonable person could find that Dixon put Plaintiff in fear of *imminent peril.* Dixon had no gun at the time, nor any mechanism to harm Plaintiff. Dixon did not in any way have the present ability to effectuate his "threats." Because Plaintiff's evidence presents no material fact in dispute, the Court will not analyze whether Dixon's comments can be imputed to Defendant.

### IV. Conclusion

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 65) is hereby **GRANTED**. This case is removed from the February 2003 trial docket, and the Pretrial Conference on January 21, 2003 is cancelled.